## Plumer *versus* Guthrie.

1. To show by parol that a deed absolute on its face is a mortgage, the proof must be clear, explicit and unequivocal.

2. The proof must establish an agreement substantially contemporaneous with the execution and delivery of the deed, and not rest on the subsequent admissions and declarations of the mortgagee only.

3. Guthrie's land was sold at sheriff's sale, purchased by Lane, a creditor; he conveyed to Plumer. Evidence of conversations between Lane and Guthrie, months before the conveyance to Plumer and not in his presence, tending to show an understanding that Plumer would advance Guthrie's debt to Lane, and take the property as security for Guthrie, *Held* to be inadmissible.

4. To convert an absolute deed into a mortgage, the contract to do so need not be express, it may be inferred from facts and circumstances; but a knowledge of these must be brought home to the owner of the legal title before he can be affected by them.

5. Evidence of such facts and circumstances should be received with caution, and if it does not make a case on which a chancellor would decree a conveyance, should not be submitted to the jury.

6. Eleven years after the conveyance to Plumer he made a lease of the land to Guthrie, who took possession under it. If the original conveyance to Plumer was a mortgage the lease was evidence of Guthrie's abandonment of it.

7. Evidence in this case not sufficient to submit to a jury on the question whether the deed was a mortgage.

October 19th 1874. Before Agnew, C. J., Sharswood, Williams and Mercur, JJ.

Error to the Court of Common Pleas of *Clarion county :* No. 14, to October and November Term 1873.

This was an ejectment brought January 28th 1870 by Margaret Plumer against James W. Guthrie for three tracts of land, and a large number of town-lots. The case was tried August 28th 1872, before Jenks, P. J.

On the trial it appeared as follows :—

The land had belonged to the defendant and on the 25th of July 1849, he executed a mortgage on the whole of it to the trustees of the estate of William Bingham, deceased, to secure the payment of $16,500. A scire facias was issued on this mortgage by Samuel M. Lane and others, trustees and assignees of the estate of William Bingham, deceased, in which judgment was confessed by the defendant, September 4th 1846, for $22,959.77. Under a pluries levari facias on this judgment, the land was sold by the sheriff to Samuel M. Lane and A. N. Meylert for $10.106, and the sheriff's deed to them acknowledged September 10th 1857. Through a number of mesne conveyances the whole property became vested in Samuel M. Lane, February 23d 1859.

On the 14th of May 1859, Lane and wife by indenture, for the consideration of $9500, conveyed to Arnold Plumer all the real estate included in the mortgage, describing it. In this deed it is further contained as follows :—

[Plumer *v.* Guthrie.]

"And the parties of the first part hereto, for the considerations aforesaid, do hereby assign, transfer and set over unto the said Arnold Plumer, without recourse to them, the judgment obtained by a scire facias on said mortgage, also a judgment in the Common Pleas of Clarion county, wherein S. M. Lane and A. N. Meylert, trustees, are plaintiffs, and J. W. Guthrie is defendant. Being a judgment taken for the same debt for which the mortgage of J. W. Guthrie above stated was given and collateral thereto. And the said parties of the first part do further grant, &c., unto the said Arnold Plumer, his heirs or assigns, all the interest, &c., of the parties of the first part hereto, of, in and to all the lands, tenements and hereditaments included in a certain article of agreement between S. M. Lane and A. N. Meylert, trustees, of the first part, and J. W. Guthrie of the second part, dated the 10th day of May, A. D. 1852, and of the purchase-money arising therefrom; the balance of purchase-money due on the lands, &c., included in said agreement; and not heretofore deeded to Guthrie or his assigns in pursuance of it, amounts to about $1500, the intention hereof being to assign and transfer the balance of purchase-money due as stated, without any recourse to the parties of the first part hereto for any deficiency therein. The said Arnold Plumer to convey the lands, &c., as described in said contract and not heretofore conveyed by Lane and Meylert to said Guthrie or his assigns, on his compliance with said contract, in the same manner as agreed upon between the original parties thereto, and to save and keep harmless the parties of the first part hereto from any liability on account of the covenants therein contained to make deeds in pursuance thereof. The above-mentioned lands, land contracts, judgments and mortgage being the same which vested in the parties of the first part hereto, by virtue of a partition made in pursuance of an Act of Assembly of Pennsylvania, approved the 15th day of April, A. D. 1854, entitled 'An act relative to the estate of John Bredin, deceased,' &c., by which (the parties in interest) released, conveyed, assigned and transferred to said S. M. Lane, all their interest therein, and he became the sole owner thereof." * * *

Arnold Plumer died leaving a will, dated April 18th 1869, and proved May 10th 1869, by which he devised all his property real and personal to his wife Margaret Plumer the plaintiff.

The plaintiff here rested.

The defendants gave in evidence record of a suit, trustees of the Bingham Estate against J. W. Guthrie, and judgment July 5th 1850 for defendant for $18,000, assigned November 14th 1850 to N. A. Lowry, of Jamestown, New York, assigned by Lowry to Arnold Plumer October 29th 1852, and receipt February 9th 1853 to sheriff by A. Plumer for the debt and interest $19,564.09.

Also a record of judgment J. W. Guthrie against William McKinley for $109. Also of judgment same against same for $100,

[Plumer v. Guthrie.]

both assigned December 5th 1851 to N. A. Lowry, and by him assigned December 3d 1852 to Arnold Plumer. Also judgment J. W. Guthrie for use of N. A. Lowry against Clarion township for $574.53, assigned December 5th 1851 to Arnold Plumer and paid to him.

R. Allison testified that he and Guthrie had an interest in a vacant piece of land: a warrant was issued to witness July 11th 1851 ; witness wishing to dispose of his interest, Guthrie proposed to take the whole, and witness at his request transferred his interest to N. A. Lowry, November 5th 1851. Guthrie paid him $50, but Lowry paid him nothing. On the 27th of October 1852 W. H. Lowry, executor, &c., of N. A. Lowry, conveyed to Arnold Plumer ; a patent was issued to Plumer January 28th. 1854. Plumer afterwards sold the land for $2750. Guthrie, when he requested witness to convey to Lowry, said that it was to secure advances that Lowry was making to him; Lowry assented to it.

W. H. Lowry, son and executor of N. A. Lowry, testified : that his father and Guthrie had extensive dealings and lumber contracts for the delivery of lumber at Cincinnati; his father had judgments against Guthrie during the life of the contract, taken as collateral security for its performance and to secure advances made by N. A. Lowry, who died February 1851, before a settlement was made ; witness proposed to Guthrie to cancel the contract and surrender the securities on payment of the balance due N. A. Lowry. "I afterwards met Arnold Plumer and the defendant at Clarion, in pursuance of that arrangement, and I was there offered $15,000 by Mr. Plumer, and he was to take the position occupied by the estate with reference to those securities; I refused to take it, and separated without any settlement; by subsequent agreement I afterwards met the defendant and Mr. Plumer at the Monongahela House in Pittsburg, and there made an arrangement, by a writing I gave at that time, that on the payment to us of $11,000 within a certain time, I would transfer all of our securities to the party paying or securing to us that amount of money ; at the time this proposition was made there were doubts as to whether the judgment against the Bingham trustees would be affirmed; that was my reason for making the proposition I did, for if I had been certain of its affirmation, I would not have made the proposition I did ; the proposition was made sometime in the fall of 1852 ; this proposition was consummated, I think, within thirty or sixty days afterwards at Warren, by the transfer of the lumber contracts and all securities received from the defendant, to Arnold Plumer, for $11,000, in negotiable paper ; the first payment was made in hand, or a short payment, and the balance on time, extending through several years ; the defendant brought Mr. Plumer to me, and it was through the defendant I negotiated with Mr. Plumer ; if we had acquired any title to lands from or through the defendant, we

transferred them and all contracts and securities that we held, growing out of the transactions, to Mr. Plumer."

Being cross-examined, he said: "The assignments of judgments and collaterals spoken of in my examination in chief were absolute; I suppose they were absolute on their face; I have no recollection whether the word collateral was used or not; I only inferred from my father's general custom of doing business that they were absolute; I have never found anything among my father's papers to show that they were held by him as collateral; I was more or less cognisant of the transactions between my father and Mr. Guthrie; I have no recollection of any contract in writing between my father and Mr. Guthrie, as to how these securities were held by my father; I know that Mr. Guthrie was largely indebted to my father at the time these judgments and collaterals spoken of were assigned to him; my impression is that sums of money were advanced by my father to defendant after the date of the assignments, but cannot be positive as to that without reference to my books and papers; there had been some lumber delivered on the contract before the assignment was made to Plumer, but cannot say how much; at the time these assignments were made to Plumer, we pretended to own the lumber and material at the mills at that time; do not remember whether the mills were running or not; the man in charge of the mills was put there by my father to represent his interest; I think my father furnished the superintendent money from time to time to carry on the mills; I furnished money more or less after my father's death to Mr. Davis to run the mill, and Davis paid me some $3000 out of the avails of lumber sold; the Guthrie debt, including advances and everything else, at the time of my father's death, amounted to about $24,000, and was inventoried by the appraisers at $12,000; Mr. Guthrie first approached me; he came to Jamestown, I think, to see on what terms I would settle; I cannot say positively whether I first approached Guthrie or he me, in regard to a settlement.

"I had been to Clarion two or three times, and was determined to close the matter up; but, as I said before, my impression is that he, Guthrie, first approached me on the matter; I cannot tell how much money had been delivered on these contracts."

Examination in chief resumed: "For some years previous to the time of his death, my father had been in delicate health; I was thoroughly acquainted with his business, and was sort of a confidential clerk, and there were but few transactions at that time but what I was thoroughly cognisant of; these assignments, if they were absolute on their face, I always considered as collateral."

In answer to the question, "Do you know the fact that these assignments were held as collateral, from conversations had between you and your father, prior to his death?" he said:—

"I know at the time father had made large advances to Mr.

[Plumer v. Guthrie.]

Guthrie, and became alarmed as to his securities, and considered them very doubtful up to the time he received the assignment of the Bingham and other judgments, and even then he considered himself far from safe, as he had very great doubts as to whether the Bingham judgment would be affirmed; he thought if the judgment was paid he would get out whole; at that time Guthrie's title to some of the lumber property was not perfected, as there were large sums due for purchase-money; I know that these assignments were deemed collateral by my father; I considered that if the Bingham judgment had been paid and the lumber contracts fulfilled, my father would have been made whole, and made a margin of profit on the contract."

C. B. Curtis testified: "After N. A. Lowry's death an arrangement was made between his executors and Arnold Plumer, by which the executors were to transfer all their claims and securities to Arnold Plumer, for a sum which was agreed upon; that arrangement was consummated at Warren, I think, in October 1852; all the parties being present—Guthrie, Plumer and the executors. These transfers were in writing; I was acting attorney all the time, first for Nathaniel A. Lowry, in his lifetime, and afterwards for his estate, and was present at Warren when the arrangement was made; William H. Lowry was the principal man acting for the estate, and Plumer was acting for himself, of which he was capable; the amount agreed upon was closed up by Arnold Plumer's bank notes; it was talked by and between the parties just what the interest of Lowry was at the time; I mean to say, that by conversations between the parties, during the negotiations, they knew what the interest of Lowry was, and the relations he bore to Guthrie concerning these advancements; when I say parties, I mean to refer to Plumer and the executors of Lowry; I recollect that the Burdick judgment was talked about as a security, but I do not know the particulars in regard to it; the defendant in this suit seemed the most anxious to consummate the arrangement; the object of the arrangement, as I learned it from the parties, was to put Arnold Plumer in the position which the estate of Lowry occupied. This was about twenty years ago."

S. P. Johnson testified: "In 1852 I was attorney for James W. Guthrie in a suit against C. R. Burdick, in the recovery of a judgment for $1425.80; subsequently, in October of that year, this judgment was assigned by J. W. Guthrie to Arnold Plumer; I continued to be the attorney for the plaintiff for the collection of this judgment until the fall of 1860; between January 12th 1854 and July 15th 1857, inclusive, I find credits on my books to Arnold Plumer $915.53, as collected upon the judgment against Burdick. * * * While acting as attorney for Mr. Plumer in the collection of this judgment, he stated to me in conversation that he had received the assignment and held the same either as a

bonus or as collateral security for the assumption of certain lia-
bilities of Mr. Guthrie, which he had made; the substance of
what he said was that it had cost him nothing and professed a wil-
lingness to reassign the same to Mr. Guthrie at any time, which
he did do, I think, at my instance; in 1852, and prior to that
time, as attorney for Mr. Guthrie, I was familiar with his affairs
and embarrassments, and knew the fact that Mr. Plumer about
that time undertook to assist Mr. Guthrie through 'his financial
embarrassments, and as his security for so doing obtained from
Mr. Lowry and Mr. Guthrie the assignment of judgments and
other securities to a large amount as collateral, the particular items
of which I cannot now name, except the one above mentioned and
a large judgment which Mr. Guthrie had against the trustees of
the Bingham estate; I frequently urged, in later years, both
Messrs. Guthrie and Plumer to have a settlement of their matters;
both promised me it should be done, each claiming that the other
was probably indebted to him."

Being cross-examined, he said, under objection: "The conver-
sation I had with Mr. Plumer in regard to a settlement with
Guthrie was in 1860, and again in 1865; I do not think Mr.
Guthrie and Mr. Plumer were together when I had these conver-
sations with either; I think Mr. Plumer claimed that Guthrie was
indebted to him, but he did not deny that he was holding property
in trust, both real and personal; I was on confidential terms with
them both; I was attorney for both. * * * Mr. Plumer admitted
to me that he had taken N. A. Lowry's place in his relation to
Mr. Guthrie, and had received from him the securities that Guthrie
had placed in his (Lowry's) hands, and that he had assumed certain
liabilities for Mr. Guthrie; I can't recollect that Mr. Plumer
ever specified any securities that he held in trust other than
those referred to; I can't say that Mr. Plumer ever told me any-
thing about his purchase of real estate owned by Guthrie, or of
his holding any in trust for Guthrie; our conversation was usually
upon the hypothesis or supposition that each of us knew the facts
in the case, and I recollect of no specific declarations of Mr.
Plumer on the subject."

The defendant gave in evidence the deposition of S. M. Lane:
the parts in brackets were objected to, admitted and a bill of excep-
tions sealed.

The deponent testified: "In the spring of 1851, Judge Bredin,
Samuel A. Purviance, A. N. Meylert and myself, purchased from
the Bingham estate their unsold lands in Clarion, Jefferson, Forest
and Venango counties, with the unpaid purchase-money on con-
tracts on lands sold, and mortgages, judgments, &c., all their
interest in said counties; included in the purchase was a mortgage
given by James W. Guthrie to the Bingham estate on certain
farms in Clarion county, town property in the town of Stratton-

[Plumer v. Guthrie.]

ville, and in the town of Clarion, Clarion county; some years afterwards (probably three or four), Mr. Purviance, who was the attorney of the company, and myself, who was attending to the business at the time, got Mr. Guthrie to give a judgment on an amicable scire facias on the mortgage; some time afterwards, a year or two more or less, I can't tell how long, it was entered of record; the property was sold, judgment was entered on this paper whatever it was, and afterwards the property was sold and bid in for us; I presume it was on that judgment; it remained in that way, Mr. Guthrie still having possession of his property; Mr. Guthrie commenced writing to me then; I received letters from him with regard to this property; [I went to Clarion on some business in the summer of 1858, I think; while there Mr. Guthrie sent a messenger down from Strattonville, with an urgent request that I come to see him; I went to see him; he commenced immediately to talk about this mortgage property;] he said to me that he understood we were going to make a division, or I told him that; [Mr. Guthrie wanted me to get this property that he had owned in my division; he said that he had a friend who would pay a certain amount of money for the mortgage property; either then or afterwards he named the amount of $9000, that his friend would pay, and take this property for him if I could get it; I told him that I wanted the entire balance of my interest there to net me $12,000; I reserved my interest in the Fox and Beaman bonds, which amounted to $2500 about, leaving $9500 to make it $12,000; Mr. Guthrie said he would pay the $500, as his friend would only pay the $9000, as that was all he had arranged for, or spoken about.] I think when I returned from Mr. Guthrie's to Clarion I met Arnold Plumer on the street at Clarion; he spoke to me and said that Mr. Guthrie had been at him to get this property for him; he supposed he would have to arrange it. [Then I believe was the first time I knew who Mr. Guthrie's friend was; he had never told me; I had told Mr. Guthrie that if I could arrange it to get this property in the division I would, to meet his views; the matter was in negotiation between Judge Campbell, James Bredin and myself, for some time; we finally agreed upon a division, giving me this property and a certain contract, together with my interest in the Fox and Beaman bonds; I did not want to take it till I should see Mr. Plumer and see if he would take it from me.] Early in the summer of 1859, I think, I met Mr. Plumer at the Monongahela House in Pittsburg; Mr. Plumer said to me there, 'About that Guthrie business, or about that property of Guthrie's, I might as well fix it up one time as another: if you will get the papers prepared I will do it at once;' I got the papers ready; Mr. Plumer paid me the money at the Monongahela House ($9000), for the mortgage property and a certain contract of about $1500; he got the deed and that is about

all of it.   [Mr. Guthrie told me to make the title to Mr. Plumer.
This mortgage, property and the contract did not make up the
amount I had agreed to take by $500; he told me to close it up
with Mr. Plumer and he would pay the $500; I saw Mr. Guthrie
afterwards and he gave me his note at six months; I sent the note
to Mr. Reed and he collected the money; I took this mortgage
property and this contract entirely at the instance of Mr. Guthrie
and to oblige him: all the bargaining and contracting in this trans-
action was with Mr. Guthrie, except what I have stated that Mr.
Plumer said; the arrangement that I made with Mr. Guthrie
concerning this property was carried out by Mr. Plumer in good
faith.]"

Being cross-examined, he said: "I was to get in my division
the Guthrie mortgage, this contract and my share of the Fox and
Beaman bonds, then these arrangements with Mr. Guthrie referred
more especially to the mortgage and the contract; in my division
I took the premises which had been mortgaged; the property was
bid in for us and was then the property of our company; my con-
versations with Mr. Guthrie were after the property had been sold
and bid in for us; I never had but two conversations with Mr.
Plumer about this property; at neither of these conversations did
Mr. Plumer say that he was purchasing this property for Mr.
Guthrie?   At the first conversation in Clarion he said that Mr.
Guthrie wanted him to get this property for him; he said that he
supposed he would have to arrange it; I am not certain that he
wanted him to get it for him, but I think he did; * * * he never
stated in so many words that he purchased this property in
trust for Mr. Guthrie; * * * I understood that Mr. Plumer was
buying this property for Mr. Guthrie, although he did not tell me
that; that was my impression; * * * from Mr. Guthrie's negotia-
tions in the first place, followed up and consummated by Mr.
Plumer; I had no doubt about it; that made the impression on
my mind and I had no doubt about it."

F. B. Guthrie, a son of defendant, testified as to Plumer furnish-
ing money to his father, of their joint transactions in timber, &c.;
he further testified: "Plumer resided at Franklin and did not see
to the business only to take the money; my recollection is that my
father sold the mill property to Burnell & Wheeler, in 1854 or
1855, think in 1855; in 1866 and 1867, I was living in Titus-
ville and practising law there; I had an interview with Mr. Plumer
at his house, but can't remember the time; it was in cold weather;
it was after the death of Burnell; in January or April 1867, I
had frequently urged my father to get this matter settled up; Mr.
Burnell had died; I went to Mr. Plumer's house; went in and
sat down; said to Mr. Plumer that I wanted that thing settled
up; that my mother and brother were dead and I wanted it set-
tled during the lifetime of my father; that I cared nothing about

[Plumer v. Guthrie.]

it myself as I could take care of myself, but that I had a sister whose interest I thought I should look after; I told him that I understood that he held the title to my father's property or a large portion of it, in him; he said that he did; I told him that my father alleged that he had paid him for all the money that he had ever advanced to run the mills and buy the lands, the title to which he had; I told him that if that was the case, that the matter should be settled up during the lifetime of both of them; that my father was getting old as well as he; that Mr. Burnell and Mr. Davis, two of the men that knew most about the matter, were dead; I asked him then about the state of the accounts between them, and he said, You know, Mr. Guthrie, that I will have to charge for my time, trouble and the risk I had to run; I said certainly; he said that he did not think there was a great deal of difference in the money or accounts, either way; he said he did not know exactly how they did stand; that he had received moneys from judgments and from notes, and had advanced money to run the mills and to buy the mills; had been talking about the old homestead at Strattanville, and the old farm that I did not like to see go away; he said, I will see that these things are fixed up before I die, and that the property should be reconveyed if my father had got out of his financial difficulties, so that he could hold it; I heard the conversation at Strattanville, 1st June 1853, at the time the money and notes were delivered to Plumer; Plumer said, You know, Mr. Guthrie, that I want to hold collaterals enough to keep me safe, and that he would advance money to Mr. Davis as he would need it." * * *

The defendant gave much testimony as to the value of the land in dispute and covered by the mortgage.

The plaintiff in rebuttal gave in evidence the record of a bill of discovery in the Court of Common Pleas of Clarion county, of December Term 1856, in which Thomas Mellon was plaintiff and J. W. Guthrie and others defendants.

The 10th interrogatory was:—

"State whether said Arnold Plumer did not purchase, or does not hold in trust for said James W. Guthrie, to some and to what extent, a large quantity of real estate in said county of Clarion, conveyed to said Arnold Plumer by Samuel M. Lane and wife, by deed dated the 14th day of May 1859.

The answer of J. W. Guthrie was:—

"That he cannot say how Plumer's matters and his may close up, as he has never settled with him since their first transactions in business."

The plaintiff gave in evidence an agreement dated April 16th 1850, between Guthrie and N. A. Lowry; by it Guthrie agreed to sell and deliver to Lowry at least 6,000,000 feet of pine boards and as many more as he could manufacture at his mills, until the

26 P. F. SMITH—29

[Plumer *v.* Guthrie.]

1st of May 1852. The agreement specified the prices of the different kind of boards; Lowry to advance to Guthrie within sixty days $5000 in cash and $1228.29 in merchandise, but no further advances to be made until Lowry had delivered 1,000,000 feet of boards; after the receipt of 1,000,000 feet, Lowry to advance at the rate of $2 per M. for running purposes; the boards to be sold at the lower markets; " and the net profits arising from such sale, over and above the expenses necessarily incurred and above the purchase price of $5.25, and $8 per thousand feet to be shared equally by said Guthrie receiving one-half and said Lowry retaining the other half. The amount of profits which may accrue to said Guthrie as his portion is to be applied toward the liquidation and payment of advances which may have been previously made by Lowry, as fast as said profits are realized. Boards to be measured in the market below where sold. All advances of Lowry to be upon interest until repaid."

Plaintiff gave in evidence also the statement of an account between Lowry and Guthrie transferred to Plumer in 1852. By this account it appeared that on the 18th of August 1852 there was due from Guthrie to Lowry $17,317.57.

The article of agreement between Lowry and Guthrie was assigned by Lowry's executor to Plumer on the 27th of October 1852, and it was cancelled August 27th 1853, by endorsement on it signed by Plumer and Guthrie.

The plaintiff gave in evidence a large number of notes and duebills from Guthrie to Plumer, commencing July 8th 1852; also a number of checks of Plumer in favor of Guthrie; also a number of judgments against Guthrie assigned to Lowry, and by his executors assigned to Plumer.

A statement of Plumer's account against Guthrie showed a balance of $26,270.46 due to Plumer May 14th 1859.

Plaintiff gave in evidence a lease, dated February 3d 1866, from Plumer to Guthrie, for all the property in dispute for one year from the next 1st of April at a money-rent of $100, and one-third of the products of the land, and if Plumer should desire the property or any portion of it before the termination of the lease, Guthrie to surrender it on thirty days' notice, Plumer paying such damages as Guthrie might sustain.

The plaintiff's points were:—

1. If Arnold Plumer was indebted to James W. Guthrie on an unsettled and uncertain account, at the time he bought the land in controversy, and in consideration thereof, he made a parol agreement with him to buy the land for him and hold it in trust; and Arnold Plumer bought it and took the deed to himself, absolute on its face, and paid for it with his own money, although in violation of his contract, it would not raise a resulting trust, but would be merely a parol sale, and void under the statute.

[Plumer v. Guthrie.]

2. In order to establish a resulting trust, the evidence must be "*clear, explicit and unequivocal,*" that the land in controversy was paid for with Guthrie's money at *the time of the sale,* and in the absence of such evidence, it is the duty of the court to give binding instructions to the jury to find for the plaintiff.

3. James W. Guthrie, by taking a lease from the plaintiff's testator in 1866, for the premises in dispute, has surrendered any trust or equitable estate he may have had, and by his deed is estopped from setting up any title in hostility to his landlord.

4. If the jury should find, under the evidence in this case, that there was a resulting trust in favor of J. W. Guthrie, such trust would be barred by the statute of 22d April 1856, more than five years having elapsed after he acknowledged himself to be the plaintiff's tenant.

5. By the article of agreement between N. A. Lowry's executors and Arnold Plumer, and the assignment of all his claims on J. W. Guthrie to Plumer, he, Plumer, became invested with the absolute right to the entire indebtedness of Guthrie to Lowry, precisely as Lowry held them before the assignment.

6. If at the instance and by the procurement of J. W. Guthrie, Arnold Plumer purchased the lands in controversy, and held the same by deed absolute on its face, though secretly in trust for Guthrie, to conceal them from his creditors, such concealment would be fraudulent, and Guthrie could not resist the legal title of his alleged trustee.

7. Conceding all the testimony on behalf of the defendant in this case, it raises no trust, either *ex maleficio* or resulting from payment of purchase-money, that authorizes the court to submit to the jury; but, as a chancellor, the court is bound to take the evidence from the jury, and give binding instructions to find for the plaintiff.

8. There is no evidence in this suit that the consideration of the deed from S. M. Lane to Arnold Plumer was a pre-existing indebtedness of Plumer to Guthrie; nor of money loaned by Plumer to either Guthrie or Lane. Nor was any indebtedness admitted by Plumer as the basis of his purchase, or any evidence of agreement to reconvey to Guthrie on payment to him of the consideration of that purchase; and if there was an unsettled account, or even indebtedness to Guthrie by Plumer, it being unsettled and indefinite in amount, it is too remotely connected with the conveyance by Lane to Plumer to justify the court in submitting it to the jury upon which to find a mortgage.

The defendant's points were:—

1. If the jury believe from the evidence that by an arrangement between Nathaniel A. Lowry and James W. Guthrie, there was an agreement by which Guthrie was to obtain a satisfaction of the whole debt due by him to Lowry's estate, and to have a return of

[Plumer *v.* Guthrie.]

the collaterals by him transferred to Lowry in his lifetime, in consideration of $11,000; and if Plumer, understanding this arrangement, and acting under it for Guthrie's benefit, advanced $11,000 in notes to Lowry's executors, and took assignments of the collaterals merely for his own security, any sum of money he might realize over the said advancements and interest from said collaterals, he would hold and be accountable for as Guthrie's trustee.

2. If at the time Plumer received the deed from Samuel M. Lane, he received the same under a purchase made by Guthrie, and for his benefit, under a previous arrangement with Lane, he, Guthrie, paying a part of the consideration, and Plumer the balance, he having at the time money in his hands of Guthrie, sufficient to pay the sum in full, this would be a resulting trust in favor of the defendant.

3. If Guthrie made the bargain with Lane, by which he was to have the benefit of the transfer from Lane, on his paying the sum of $9500, and Plumer, either by his acts or declarations, induced Guthrie to believe that he would hold for his benefit, and thus obtained from him an advantage, *inter alia*, the payment of $500, the consideration which he could not otherwise have obtained from him, it would create a resulting trust in favor of defendant.

4. The lease executed by Guthrie to Plumer in 1866 can have no greater effect than evidence, *inter alia*, to show the nature and design of the original contract, or to show the intention of the parties in making the same.

5. If the jury believe from the evidence that the deed of Lane to Plumer, conveying the premises in dispute, with the mortgage and bond, along with the article of agreement between Bingham's trustees and Guthrie, was made under previous arrangement between Lane and Guthrie, and for Guthrie's benefit, he, Guthrie, paying $500 of the consideration, and retaining the possession, and that the $9000 paid by Plumer was an advancement which the deed was intended to secure, the mortgage-debt, which would otherwise have been extinguished, surviving to the use of Plumer, the whole arrangement would only operate as a mortgage in favor of Plumer, which the subsequent lease could in no wise affect.

The court answered the points in the general charge, reading to the jury each point before answering it.

The court charged:—

"1. J. W. Guthrie, the defendant, having entered into business relations with one N. A. Lowry, upon settlement, was found indebted a considerable sum of money.

"By an arrangement with Lowry's executors, with the consent of Guthrie, Arnold Plumer became, in October 1852, the purchaser of Lowry's claims, and also of all of the collateral securities and lumber contracts, which Lowry had from, or entered into with Guthrie for the sum of $11,000.

[Plumer *v.* Guthrie.]

" In addition to the claims which Lowry held and assigned, it is alleged by plaintiff, that Arnold Plumer advanced a large amount of money in aid of Guthrie, and that on account of these claims there exists a large balance against Guthrie which has not been paid.

" The defendant alleges that out of the collaterals placed in Lowry's hands, assigned to Plumer, and from the proceeds of lumber paid to him, Plumer has received a greater sum than Guthrie's entire indebtedness to him.

" 2. In addition to this it is alleged that Guthrie was largely indebted to the estate of William Bingham. That to secure this indebtedness he executed a mortgage, in the penal sum of $33,000, conditioned for the payment of $16,500, at the times and manner therein mentioned. That this mortgage was assigned to Lane, Meylert and others. That upon a judgment foreclosing this mortgage the property in controversy was sold and title thereto, ultimately became regularly vested in S. M. Lane. That negotiations were opened, looking to the purchase of this property from Lane, in which Guthrie and Plumer participated, and which finally resulted in a transfer of Lane's interest to Arnold Plumer for a consideration in the deed mentioned. Out of these transactions, extending over a period of more than twenty years, this controversy has arisen.

" The facts and principles supposed to be important in determining the rights of the parties have been referred to by the counsel for plaintiff and defendant, in certain written propositions submitted, and the instruction of the court requested thereon, with the view, under such instructions, to enable you rightly to determine this controversy. Premising this single remark, that each fact assumed or stated in the several points must be found by you upon sufficient evidence, and that fraud is not to be presumed, we read and answer these propositions as follows :—

" The plaintiff's first point we answer in the affirmative.

" The plaintiff's second point we also answer in the affirmative, save as to so much of the point as affirms it to be the duty of the court to give binding instructions to the jury to find for the plaintiff. The existence or non-existence of a trust, is not the only question raised in the case, we cannot therefore answer this part of the point as requested.

" The fourth point of the plaintiff we answer in the negative.

" The fifth point of plaintiff we answer in the affirmative, thus qualified : that if the facts assumed in this point be all that relate to the transactions therein referred to, but if in addition to these, the facts assumed in defendant's first point, entered into and formed a part of the transaction, the conclusion stated in plaintiff's fifth point would not follow, but that stated in defendant's first

[Plumer *v.* Guthrie.]

point would follow : the defendant's first point is therefore answered in the affirmative.

" The facts referred to in both of these points we leave to the jury.

"We answer the plaintiff's sixth point in the affirmative.

"We answer the plaintiff's seventh point in the negative.

"We answer the defendant's second and third points in the affirmative, but remark that the evidence proving the facts therein assumed must be clear, explicit and unequivocal.

"We answer the plaintiff's third, and the defendant's fourth points as follows : Do all of the facts and circumstances in the case clearly prove that Guthrie was a borrower, arranging for security to his lender, and Plumer a lender advancing money and taking the land, in the form it was given, as security for the money advanced ? If this was the nature of the transaction, we answer the plaintiff's third point in the negative, and defendant's fourth point in the affirmative. But, if the land was purchased by Plumer in trust under the circumstances alleged by plaintiff, the conclusion stated by the plaintiff in this point would follow, and that stated by the defendant in his fourth point would not. The determination of the facts is for the jury.

" The plaintiff's eighth point and defendant's fifth point we thus answer. Do all of the facts and circumstances in the case relating to the transactions referred to in these points clearly prove that Guthrie was a borrower, arranging for security to his lender, and was Plumer a lender, advancing his money and taking the land, in the form it was given, as a security ? The facts and circumstances proving this, must be clear, explicit and unequivocal. Whether the relation above stated be thus proven we leave to the jury. This, we think, substantially answers the plaintiff's eighth point in the negative and defendant's fifth point in the affirmative.

" The principal legal questions in the case may be stated thus :—

" 1. If the evidence satisfies you that the property was purchased by Plumer in trust for Guthrie, your verdict should be for the plaintiff.

" 2. If the evidence proves that it was purchased by Plumer with the understanding between Plumer and Guthrie thus to protect it against the creditors of Guthrie, the plaintiff is entitled to recover.

" 3. If the property was conveyed to Plumer to be retained by him as security for money advanced by him in saving the title for Guthrie, you will then inquire, according to the principles we have already referred to, whether he has been fully paid ; if not, find and state the amount. Also find the time in which it ought to be paid. In the event of such finding, the time ought not to be unreasonable. If you come to this last conclusion, we will mould your verdict upon your finding the facts. If you find that the

[Plumer *v.* Guthrie.]

land was obtained and held as security for money advanced, and all the money has been fully paid, your finding should be generally for the defendant."

The jury found "for the plaintiff the land mentioned in the writ, to be released upon the payment of $4000, with interest thereon from this date, to be paid as follows, to wit: One-fourth on the 5th day of December, A. D. 1872; one-fourth on the 5th of March 1873; one-fourth thereof on the 5th day of June 1873, and one-fourth on the 5th day of September 1873, with costs of suit."

The plaintiff took a writ of error, and assigned for error:—

1. The admission of that portion of Lane's deposition objected to.

3–7. The answers to the plaintiff's 3d, 4th, 5th, 6th and 7th points.

8–12. The answers to the 1st, 2d, 3d, 4th and 5th points of the defendant.

*J. B. Knox* and *J. Campbell*, for plaintiff in error.—Lane's testimony was of conversations with Guthrie and Lane when Plumer was not present, and Guthrie would thus be making evidence for himself, which cannot be done: Duvall *v.* Darby, 2 Wright 56; Romig *v.* Romig, 2 Rawle 248; United States *v.* Mertz, 2 Watts 406; Blight *v.* Schenk, 10 Barr 292. The parol evidence is of the lightest kind, and it is asked that it should not only overturn the deed, but also set up a title of a tenant against his landlord, without surrendering the possession. This cannot be done: Porter *v.* Mayfield, 9 Harris 263; Boyer *v.* Smith, 5 Watts 55; Bennett *v.* Fulmer, 13 Wright 156. In such case as this the judge alone is the chancellor, and the verdict of the jury is only advisory: Todd *v.* Campbell, 8 Casey 252; De France *v.* De France, 10 Id. 385; McGinity *v.* McGinity, 13 P. F. Smith 38.

*G. A. Jenks* and *W. L. Corbett* (with whom was *T. S. Wilson*), for defendant in error.—The question whether the conveyance was absolute or as security was properly submitted to the jury: Kunkle *v.* Wolfersberger, 6 Watts 126. The relation of landlord and tenant is not inconsistent with that of mortgagor and mortgagee: Doe *v.* Maisey, 8 Barn. & Cress. 767; Hammet *v.* Dundas, 4 Barr 181; Horn *v.* Pattison, 1 Grant 304. The mere delay does not affect this question: Odenbaugh *v.* Bradford, 17 P. F. Smith 97; Harper's Appeal, 14 Id. 315.

Mr. Justice MERCUR delivered the opinion of the court, January 4th 1875.

That a deed, absolute on its face, may be shown by parol to be a mortgage only, between the parties, is too well established to require a citation of authorities. The proof, however, of the agreement necessary to so change its character must be clear, explicit

[Plumer *v.* Guthrie.]

and unequivocal. It should not rest on the subsequent admissions and declarations of the alleged mortgagee only, but must establish an agreement substantially contemporaneous with the execution and delivery of the deed. Less than this would not only conflict with the rules of evidence which prescribe the manner in which a written instrument may be changed by parol, but also defeat the wise provisions of the Statute of Frauds.

On and before the 8th of May 1857, the defendant was the owner of the lands in question. On that day all his title therein was divested by a sheriff's sale. There was no agreement by which the defendant was to retain or acquire any equities therein. The purchasers took a clear and unquestionable title. By means of subsequent conveyances and devise this title was regularly transmitted to the plaintiff. The plaintiff further proved that nearly seven years after the land was conveyed to her devisor, and while he held it, the defendant entered into a written lease with him for these lands for the term of one year, in consideration of the defendant's agreeing to pay $100 and one-third of all the hay and grain produced on the premises, to pay all taxes, to cut no timber, and to surrender possession, &c. Thus the plaintiff showed a clear paper title.

The defendant sought to convert the deed given to the plaintiff's devisor into a mortgage by an alleged parol agreement.

The first assignment of error is to the admission of certain parts of the deposition of Samuel M. Lane. He was one of the purchasers at sheriff's sale, and after acquiring the estate of his co-tenants, conveyed to Arnold Plumer, under whom the plaintiff now claims. The portion of the deposition admitted under exception relates to conversations and negotiations between the defendant and the witness. They were not in the presence of the plaintiff's devisor. They were not proven to have ever been communicated to him. They occurred some ten months prior to the execution and delivery to him of the deed. They cannot therefore form any part of the *res gestæ.* It was, then, manifestly wrong to admit the declarations of the defendant and negotiations between him and the witness, not communicated to the devisor of the plaintiff. This assignment is sustained.

The second assignment is not according to the rules and must be disregarded. The third and fourth were not pressed.

We discover no error in the fifth and eighth assignments. We think the answers of the learned judge were correct; but a failure to connect these transactions with Plumer's purchase of the land make them irrelevant.

The eleventh assignment relates to the effect which should be given to the lease executed between Plumer and the defendant. The point submitted by the defendant and the qualified affirmance thereof by the court, seems to declare that no greater effect

[Plumer v. Guthrie.]

shall be given to the lease than as evidence, indicating the nature and design of the original contract between the parties, and their intention in making it. In so restricting its effect to that particular time, we think the court erred. There was no evidence of any fraud or imposition in procuring the lease. Hence if it was admitted that Plumer originally acquired the title in trust for the defendant, yet inasmuch as this lease was executed so many years thereafter, it was at least evidence of the termination of that trust and the abandonment by the defendant of all interest in the land other than that of lessee.

The remaining assignments may be considered together. The defendant seeks by oral testimony to convert into a mortgage, a deed absolute on its face. To do this he must prove a contract to that effect: Rankin v. Simpson, 7 Harris 471. It was, however, said in Rhines et al. v. Baird, 5 Wright 256, that the agreement need not be express, but it may be inferred from facts and circumstances inconsistent with its being an absolute conveyance. We will add, that knowledge of those facts and circumstances must be brought home to the owner of the legal title before he shall be affected thereby. A careful examination of the evidence fails to show any conversation between the defendant and Plumer in relation to the latter's purchasing or taking a conveyance of the land for his benefit. None such is shown to have either preceded, or to have been cotemporaneous with, the execution of the deed. The parties to the alleged agreement were never brought face to face. No communication either verbal or written ever passed between them indicating it was a mortgage, although Plumer lived ten years after he procured the conveyance. The defendant however relies mainly on facts and circumstances shown, after this great lapse of time, and after the death of Plumer, to prove the conveyance was a mortgage only. Such testimony should be received with caution. When received, if it fails to satisfy the court as well as the jury—if it does not make out a case in which a chancellor would decree a conveyance, it should not be submitted to the jury: Rankin v. Simpson, supra; Todd v. Campbell et al., 8 Casey 250; DeFrance et al. v. DeFrance et al., 10 Casey 385; Bennett et ux. v. Fulmer, 13 Wright 155; McGinity v. McGinity, 13 P. F. Smith 38.

The defendant showed there were other large and unsettled business transactions between him and Plumer. He claims that the latter was, at the time of the conveyance, indebted to him in an amount equal to the $9000 which he paid for the land, or if not, that it was a loan by Plumer to him. No settlement of those transactions was ever made by the parties. It is not shown that Plumer admitted the existence of such an indebtedness, or of any indebtedness, or that the $9000 was a loan. It is true, Lane thinks, but will not be certain, that about a year before the con-

[Plumer *v.* Guthrie.]

veyance to Plumer, the latter said the defendant wanted him to get this property for him, the defendant. Nothing however was said at the time of the conveyance to Plumer by any one indi-. cating any such purpose. The fact that a jury may now find that if a settlement had been made between the defendant and Plumer at the time of the conveyance, the latter would have fallen in debt to the former, or that at Plumer's death he was indebted to the defendant in other business transactions, is insufficient of itself to prove that he accepted the conveyance as a mortgage. Nor does the fact that the defendant, unknown to Plumer, paid Lane $500 change the character of the written instrument. It cannot with any show of reason be said that the action of Plumer was influenced by the acts of others of which he had no notice. The burden of proof rests on the defendant. It will not do to establish a mere dim probability only of the correctness of his theory. He must go further and make the proof clear and explicit. If such proof had been given of an agreement at the execution of the deed, then the testimony of F. B. Guthrie would have been strong evidence of its continuance, and of the payment of the money. All his testimony as to Plumer's declarations made after he procured the deed, fails to establish a previous agreement. Neither in the conversation had in 1853, before the execution of the lease, nor in 1867, when the defendant was in possession under it, did Plumer admit that he had accepted the deed as a mortgage. He admitted a present willingness or intention to convey at some future time, from which it is claimed a legal inference may be drawn that he had so agreed many years before. Such effect cannot be given to his declarations. It would be fraught with great mischief and injustice. Every unexecuted intention of making a gift of real estate might be distorted into a previous valid agreement, and the Statute of Frauds be defeated. It will not do to permit a legal title in the hands of an heir or devisee to be destroyed by such vague and uncertain testimony; neither doubt, nor suspicion, nor uncertainty, nor all of them in regard to the circumstances under which the ancestor or devisor acquired title to the property, will convert it into a mortgage. As lands become more valuable the temptation to commit fraud and perjury will be increased. Hence the requirement of clear and explicit evidence of the alleged agreement should not be relaxed. We think, therefore, under the evidence, the assignments are substantially sustained.

As the case goes back for another trial we will suggest that while counsel can understand the learned judge where he combines the points submitted by each plaintiff and defendant and gives them a blended answer, it may be questioned whether the answer is made clear to the mind of the common juror.

Judgment reversed, and a *venire facias de novo* awarded.