## APPEAL OF W. S. B. HAYES.

[LEWIS STAIB v. W. S. B. HAYES.]

FROM THE DECREE OF THE COURT OF COMMON PLEAS OF WASHINGTON COUNTY, IN EQUITY.

Argued October 16, 1888—Decided January 7, 1889.

1. For purposes of partition of lands, the possession of one tenant in common is the possession of all, unless by an actual ouster, or by an exclusive pernancy of the profits against the will of the others, one shall manifest a clear intention to hold the lands adversely and in hostility to the common right.

2. To sustain partition, either at law or in equity, the plaintiff must show title, and, as a general rule, an undisputed title; yet, in cases of equitable titles and defences, a court of equity will take jurisdiction of the whole matter, determine the rights of the parties, and then grant relief by way of partition, under the same bill.

3. Under § 4, act of April 22, 1856, P. L. 533, if any trust exist, under a parol agreement for the purchase of lands, it must be one resulting by implication from the payment of the purchase money at the inception of the title, and the agreement is of importance only as exhibiting the purpose of the parties with reference to the payment.

4. To establish the title of a plaintiff by a resulting trust, that by means of it he may have partition, the bill should be so framed as to disclose its real object, and the evidence in proof of the trust must be clear, explicit and unequivocal, such as to move the conscience of a chancellor to establish it.

5. Section 15, act of June 14, 1836, P. L, 632, if it have any application to a resulting trust, does not apply to proceedings at law or in equity in respect of the title; it refers rather to the control and management of the trustee, where the trust has been created by deed or will or has been otherwise established. . . . .

6. Where a bill is filed to establish a trust in an undivided one half interest in lands alleged to have been acquired in a joint purchase, and for partition thereof, if the answer be responsive to the bill, the testimony of the plaintiff alone, though corroborated by the payment of one half of the purchase money, is insufficient to sustain the bill against the answer supported by the testimony of disinterested witnesses.

Before GORDON, C. J., PAXSON, STERRETT, GREEN, CLARK, WILLIAMS and HAND, JJ.

No. 101 October Term 1888, Sup. Ct.; court below, No. 370, in Equity.

Statement of Facts.

On September 11, 1882, Lewis Staib filed a bill in equity against W. S. B. Hayes, in substance for the partition of certain coal lands, to restrain the continuance of unlawful mining on the part of the defendant and for an account of coal mined and removed. On January 8, 1883, the defendant filed an answer, and issue being joined, *Mr. John H. Murdoch* was appointed examiner and master. On February 3, 1883, before any testimony was taken, the defendant filed a cross-bill, to which the plaintiff answered, and issue was joined thereon.

The draft following will illustrate the controversy, although the lines are not drawn to scale.

The facts and the questions arising thereon will best appear from the master's report, filed July 26, 1887, which, so far as relating to the case as decided, was as follows:

The original bill was filed August 8, 1881, upon which a preliminary injunction was granted which was dissolved upon hearing on the strength of the injunction affidavits presented

by the defendant. Subsequently the plaintiff, by leave of court, filed an amended bill, upon which he again asked and obtained a preliminary injunction which was in turn dissolved upon hearing. On January 8, 1883, the defendant made answer to the bill, and upon the filing of a replication, the court on January 15, 1883, appointed the master and examiner.

On February 3, 1885, before any testimony had been taken under the original bill, the defendant, W. S. B. Hayes, filed a cross-bill against the plaintiff, Lewis Staib. To this cross-bill Staib made answer March 24, 1885, and after replication the court on August 24, 1885, enlarged the powers of the master " so as to include the matters at issue under the cross-bill. " The testimony was adduced and taken as if the pleadings were simply an original bill, an answer and a replication.

As the master understands the rules of equity practice and pleading, this cause is to be heard and determined as one cause. The cross-bill having been filed before any proceedings were had under the original bill, the whole cause, as shown by all the pleadings and the testimony offered in support of the allegations of the parties, is considered together, with the same effect as if there were but one bill, one answer and one replication; except that upon his cross-bill the defendant may have specific relief, if he shows himself entitled to it: Story, Eq. Pl., § 395; Daniell's Ch. Pl. & Prac. 1553, 4th ed.; Randolph's App., 66 Pa. 183.

The allegations, in brief, of the original bill are as follows : That the plaintiff Staib and the defendant are the owners of a certain tract of coal land containing 200 acres, the purchase money of which, so far as paid, has been paid equally by both parties; that against the remonstrances of the plaintiff the defendant has entered upon said tract of coal and mined and carried away large quantities of coal therefrom and refuses to account to plaintiff therefor; that plaintiff is the owner of two other tracts adjoining the 200 acre tract aforesaid, in one of which the owner of the 200 acre tract has certain privileges, as appurtenant to said tract of coal, for airing, draining and driving a main entry, the exercise of which privileges is not to obstruct or hinder the owner of the servient tract from mining and conveying away his own coal; yet that defendant has exceeded any privileges which are appurtenant to said 200 acre

tract, has removed and converted to his own use large quantities of coal from both the aforementioned tracts, containing 64 and 97 acres of coal respectively, and that the trespasses of the defendant have done and are still doing great damage to the plaintiff and to his property.   The relief prayed for was restraint, discovery, account, damages for the injuries to the plaintiff's properties, and partition of the 200 acres of coal alleged to belong to both parties.

The defendant Hayes in the first paragraph of his answer denies that plaintiff has any "title, legal or equitable," to the 200 acre tract of coal, except that defendant has agreed by parol to convey him a certain portion thereof upon certain conditions with which plaintiff has not complied; that one of these conditions was that Staib was to procure title to the defendant Hayes for the 64 acre tract of coal.   He further alleges that if Staib owns the 64 acre tract he has acquired title in pursuance of said parol agreement.   He denies any aggressions or trespasses in either the 200 acres or the 64 acres, and avers that he has done nothing in either which he did not have a legal right to do.   He admits a trespass by mistake upon the 97 acre tract, but alleges that it was prior to the time plaintiff became, if he is, the owner thereof, and alleges further that plaintiff has since that time mined across the line upon defendant's coal and taken away a still greater quantity of coal than that taken by defendant.   And generally he denies the making of any aggressions upon plaintiff's rights.

The allegations of the cross-bill present more fully and clearly the positions of the defendant in this case than does his answer.   In it he avers that in the month of October, 1877, the plaintiff and the defendant were the owners respectively of two contiguous coal properties, and at that time a tract of 200 acres of coal in the rear of and adjoining both of said properties, was exposed to public sale and was purchased by the defendant Hayes at $76 per acre and that he holds the deed therefor dated February 6, 1884.   That "at or about the time of said sale and purchase it was verbally agreed" that the plaintiff Staib "should pay a proper proportionate part of said purchase money" and should purchase and convey to Hayes the 64 acre tract at a sum not to exceed $76 per acre, whereupon Hayes should convey to Staib such a portion of the 200

acre tract as would be cut off by an extension of the division line of the two contiguous tracts first mentioned, the respective portions of purchase money to be ascertained by a survey of the property. He further avers that he, Hayes, has paid the purchase money of the 200 acres, the plaintiff, Staib, " having from time to time paid him sundry sums of money on account of his proportion of said purchase money under the said agreement; " that the plaintiff, Staib, has acquired title to the 64 acres but repudiates the agreement and refuses to convey said coal land to the defendant. He also alleges that, in pursuance of the rights and privileges appurtenant to the 200 acres and of his parol agreement with Staib, he has at great expense driven a main entry and many cross entries into the 64 acres and is now ready to operate said tract of coal. Averring his willingness to comply with his agreement he asks that the agreement be established of record and Staib compelled to carry it into effect, or otherwise that it be annulled and Hayes declared to be the sole owner of the 200 acre tract of coal.

Staib's answer to the cross-bill contains distinct denials of all its averments and introduces no new matter.

It is apparent upon an examination of the bills and answers that the case naturally divides itself into two principal parts or questions, viz.: (1) what was the agreement or arrangement between the parties, with respect to these coal properties; and (2) has the defendant been guilty of any trespasses upon plaintiff's rights, which have caused an injury to him or his property and, if so, what damages is the plaintiff entitled to receive on account of such injury.

1. It is admitted by the pleadings that some agreement or understanding did exist in relation to the 200 acres of coal. The plaintiff's allegation is that it was an arrangement for a joint purchase of the property and for the joint and equal benefit of both parties. On the other hand, the defendant, denying that the plaintiff has any title, legal or equitable, to the coal land, alleges that the coal was purchased by himself and that at or about the time of the purchase he made a parol agreement to convey a certain portion of it to the plaintiff. The first paragraph of the defendant's answer and the second paragraph of his cross-bill would appear to convey the idea that the

### Master's Report.

defendant first became the purchaser of the property and after the purchase was made agreed by parol to divide with the plaintiff.

The following facts appear by the evidence before us. Under partition proceedings upon the estate of Robert Robison, deceased, George T. Work, then sheriff of Washington county, was appointed trustee to make sale inter alia of certain coal lands lying near the Monongahela river in said county. On October 2, 1877, the trustee exposed to public sale a tract of coal and surface fronting on the river and which adjoined a coal tract of 97 acres belonging to Lewis Staib, the plaintiff. W. S. B. Hayes, the defendant, became the purchaser of this front tract. There was also exposed for sale the 200 acre tract of coal, now in controversy, which lies directly back of the 97 acres belonging to the plaintiff, and the front coal and surface bought by the defendant. It also adjoins the 64 acre tract mentioned in the bills and answers, and known as the Wickerham Reserve Coal. When the 200 acre tract was put up for sale both the plaintiff and the defendant became bidders upon it, the plaintiff bidding for himself and the defendant, though present, bidding through Thomas S. Hutchinson. It appears that there were no others bidding upon the property. The two parties competed until the bids reached $74 per acre, the last bid being that of Staib, the plaintiff. At this point the bidding stopped for some reason, and Thomas S. Hutchinson approached the plaintiff and proposed the making of some arrangement, by which each could obtain part of the property and the price be kept down. At his suggestion the plaintiff and defendant came together and made some agreement. Bidding was then resumed and the property was finally knocked down at $76, upon the bid of Mr. Staib. The master is unable to find from the testimony whose name was announced as the purchaser. Subsequently, but on the same day, the two parties, in company with the trustee and Mr. Hutchinson, met at Monongahela City, where the ten per cent of purchase money required by the terms of sale was paid, one half by each, and a receipt for the whole amount taken in the name of Staib. By direction of the parties, the trustee returned the sale as made to Mr. Hayes and it was duly confirmed by the court. The balance of the first instalment of purchase money was paid

equally by the two parties and on the second instalment the plaintiff paid his full half and $120.67 additional, the balance being paid by the defendant. The difficulty between the parties having arisen before the [next and] last payment was made, the plaintiff did not pay his half of it, although he attempted and was ready to do so, and after these proceedings were instituted the defendant paid the balance of the purchase money and received a deed for the property.

The agreement between the parties was in parol and no one was present when it was made except Hutchinson, who was acting as the friend of the defendant. The testimony of all the witnesses shows that whatever the agreement was, it was made before the property was purchased by anybody. It could not therefore have been what the defendant's answer and cross-bill would seem to indicate, a parol agreement by the defendant to sell and convey to the plaintiff, but it was,—and the master so finds as a fact from all the evidence,—an agreement to make a joint purchase of the land for the use and benefit of both parties. The evidence also clearly establishes the fact that in pursuance of the agreement the plaintiff bid the property to $76 and that both parties were interested in the purchase. And although the deed was subsequently made to the defendant, the beneficial ownership was in both, which is in accordance with the claim made by the plaintiff in the first paragraph of his bill. This appears to the master to be, so far, a sufficient answer to the position assumed by the defendant's counsel upon the argument, viz.: that the allegation of the first paragraph of the bill was at variance with the proof and that the bill could not, for that reason, be sustained.

The next question to be determined is, how was the land to be divided between the purchasers, or in what proportions did they agree to hold it. On this point the testimony on one side and on the other sharply disagrees. Here the burden of proof is upon the plaintiff to sustain his version of the agreement by the evidence of two witnesses or one witness and corroborating circumstances, for the answer of the defendant, though not as clear as it might be, is sufficiently responsive to put the plaintiff to his full proofs. The plaintiff alleges that the 200 acres, being jointly purchased, was to be divided equally, each party taking 100 acres in the rear of his own river front property.

Master's Report.

The defendant's answer is silent on this point, but in his cross-bill he alleges that the division line agreed upon was an extension or prolongation of the medial line between the two front properties. Divided by such a line the parts would be unequal, the defendant getting between sixteen and seventeen acres more than the plaintiff.

The plaintiff himself testifies that he intended to buy the whole 200 acres for himself, but that the defendant and Hutchinson approached him and proposed a joint purchase and a division of the property for the purpose of keeping down the price, and thus far he is corroborated by all the evidence on the subject. He also testifies that the only division proposed and the one agreed upon, in case the purchase should be made, was an equal division and that they were to pay and, up to the time of disagreement, did pay the purchase money in equal proportions. It is claimed, however, that the plaintiff's testimony should not be believed, because he is contradicted not only by the defendant and Hutchinson, but also by his own witness Sheriff Work, as to the time of the conversation between the parties. Staib stated, although he afterward admitted the possibility of mistake, that the arrangement was made before the front tract was sold. The sheriff only saw the parties consulting once and that during the crying of the sale of the 200 acres. The master is of the opinion that Mr. Staib is mistaken as to the time the agreement was made, but he declines to give this apparent contradiction the weight and importance asked for it. The time of the conversation is a matter of no special consequence; the real matter is what did the parties agree to do.

In his cross-bill the defendant avers that the proportionate amount of purchase money to be paid by each was to be ascertained by survey, but none of the witnesses testify that that was part of the agreement, and the defendant upon cross-examination admits that, although the parties began and continued to pay the purchase money share and share alike, there was nothing said about refunding a ratable portion of the purchase money in case the division should give one party more of the coal than the other. [The fact that the plaintiff paid the half of the purchase money and that the defendant permitted him so to do, is strong evidence that it was the contract

that he should so pay, and the master finds as a fact established that such was the contract.] [2]

Other circumstances relied upon by the plaintiff to sustain his version of the contract have already been found as facts, viz.: the sale was an open public sale, the two parties were the only competing bidders for the property, and the purchase of the property was a joint purchase. Neither party then had anything to give or anything to receive as between themselves; each stood on an equal footing; each wanted the property, or was willing to take a part of it, at as low a figure as possible. There was therefore no reason why either should enter into an agreement by which he might eventually be compelled to pay for one hundred acres of coal and only get eighty or eighty-five. The only consideration for their agreement was mutual abstaining from bidding and this was as much for the benefit of one as of the other.

[The master is of the opinion that this testimony and these circumstances together come up to the full measure of proof required by the rules in equity, and unless overborne by the evidence for the defence, will sustain the position of the plaintiff upon the point under consideration.] [3]

According to the testimony of the defendant and of his employee and agent, Thomas S. Hutchinson, the plaintiff wanted only so much of the 200 acres as lay directly in the rear of his own 97 acre tract and that was all he was to get in any event; that neither the defendant nor Hutchinson knew where the lines were and did not know how such a division would leave the respective purparts, although it is intimated that the plaintiff may have known.

The inherent improbability of the defendant's version is, in view of the facts, most glaring. It appears not only improbable, but almost impossible, that the plaintiff, with knowledge of the lay of the land, should without any consideration agree to pay for half of the land and yet take over 16 acres less, or that the defendant without any knowledge of the effect of prolonging the Victory line straight through the 200 acres, should agree to do so and still pay the full half of the purchase money, and that nothing should be said on either side about adjusting any possible difference in the quantity of land by a refunding of the money.

Master's Report.

It is claimed on behalf of the plaintiff that both the defendant and Hutchinson have contradicted themselves so greatly as to the nature and terms of the agreement, that their credibility is seriously affected. It is charged that in his sworn answer and cross-bill the defendant sought to convey the impression that the only contract between the parties was a parol agreement on his part to sell to the plaintiff a portion of the 200 acre tract. This is rendered almost certain by an examination of the injunction affidavits made by the defendant. Thus on August 12, 1881, he says upon oath: " After the respondent became the purchaser of the said two hundred acre tract of coal at the trustee's sale in the said partition proceeding, he made a verbal agreement to sell the complainant a certain part of the same which he is advised that it is unnecessary to set forth for the reason that, if the complainant alleges there is a breach thereof, he has an adequate remedy at law." And on September 23, 1882, the defendant made another affidavit in which he asked that the statements of the former affidavit might be considered part of the one then made. On the same day Thomas S. Hutchinson made affidavit that he had examined both of the defendant's affidavits " and that the facts therein stated are true as he verily believes." Our attention has also been called to the contradictory statements of the defendant in the sixth paragraph of his answer and the first paragraph of his cross-bill on the subject of plaintiff's ownership of the 97 acres. If the plaintiff was, as the cross-bill alleges, the owner of that tract in October, 1877, and the defendant knew that fact, then the sixth paragraph of this answer, in which he alleges that his trespass on that tract "prior to January 1, 1880" was "before the plaintiff became, if he is, the owner of the 97 acre tract," was untrue. We are also asked in this connection to consider the rather remarkable affidavit made by Hutchinson and presented before the master July 27, 1886, the evident purpose of which was to prejudice the case of the plaintiff and which was shown to be baseless by the joint survey made under the master's direction. These are all matters proper to be considered in determining what weight should be given to the testimony of these two witnesses and they certainly cast a cloud upon their testimony.

To corroborate the testimony of himself and Mr. Hutchin-

son on this point, the defendant called J. A. Brokaw, a gentleman who makes his home with Mr. Hutchinson, and who testifies to two conversations between the plaintiff and Hutchinson, said to have occurred five or six weeks after the purchase of the 200 acres, in the course of which it is alleged that the plaintiff admitted that the division line was to be a prolongation of the Victory line, and also that plaintiff was to procure title to the 64 acres for the defendant. This witness makes the plaintiff say that he wants the " difficulty settled " without a lawsuit, to which Hutchinson replied that it could be settled by the plaintiff securing title to the 64 acres and then the line would be run straight through ; but according to the defendant's story that was the original agreement, and according to both Brokaw and Hutchinson the plaintiff was not calling that in question. What then was the difficulty, unless it was, as the witness afterward states, "about changing the line." Hutchinson testifies to the same conversations, but he says that there was no difficulty spoken of nor was there at that time any misunderstanding between the parties. According to his testimony the plaintiff wanted some written evidence of his interest in the purchase, in order that he might make some business use of it, to which Hutchinson says he replied that that was not necessary and, very irrelevantly, proceeded to state over his version of the agreement and thus drew out an admission from the plaintiff. The vagueness of Brokaw's testimony, in the absence of his memorandum, made so strangely at Hutchinson's suggestion, and the unnaturalness of the story as detailed by Hutchinson, lead the mind to hesitate over allowing such evidence to turn the scale in so important a matter, and we decline to give it that weight. [In view of all the testimony and the facts and circumstances, the master finds that not only was the purchase joint, but also that the purchasers were to hold equal interests in the property.] [4]

This brings us in natural order to a consideration of the question whether or not the division of the 200 acres between the parties was conditional upon the plaintiff acquiring title and conveying to the defendant the 64 acre tract adjoining the 200 acres. This 64 acre tract belonged to William Wickerham and according to the testimony was not for sale at the time of

the transactions under consideration. After the death of William Wickerham the coal was purchased by the plaintiff, at the rate of $100 per acre, by agreement dated September 25, 1880. In his cross-bill the defendant charges that it was part of the agreement between himself and the plaintiff that this coal should be purchased for him and that he is informed and believes that the plaintiff has acquired title thereto in pursuance of said agreement. He insists that this was an important part of the consideration moving him to agree to convey part of the 200 acres to the plaintiff. Substantially the same facts are averred in the second paragraph of the answer, but this averment was not responsive to anything contained in the bill.

As the equity of the defendant and the specific relief for which he prays depend upon his establishing the truth of this part of the transaction, the burden of proof is upon him to make it out. This he attempts to do by the testimony of himself, Hutchinson and Brokaw, the last witness testifying, as already stated, to alleged admissions by the plaintiff. Mr. Hayes testified: " When it came to selling Purpart B, which was the 200 acres, Mr. Hutchinson bid for me also. He and Mr. Staib bid it up to, I think, $74 an acre, and they stopped for some reason or another, for some time. . . . . It stopped for some time and Mr. Staib and Mr. Hutchinson got to talking about bidding against one another, and they both came over to me and we agreed there to not bid against one another and to bid it in. . . . . . Whatever was above the Victory line I was to deed to Mr. Staib, and he was to purchase the sixty-four acres of the Wickerham Reserve Coal and deed it to me." Q. " At what price ? " A. " At $76 an acre ; at the same price this was bid off, whatever that was : at the same price as the two hundred acres." Upon cross-examination he was asked whose money was to be used in purchasing this coal. He answered, " There was nothing said about money. He was to purchase it and deed it to me. There was nothing said about money at all." He gives as a reason for not himself buying the Reserve coal that it was not up for sale. The testimony of Hutchinson is to the same effect as that of the defendant.

When the plaintiff, Staib, executed the article of agreement for the purchase of the 64 acres he added to his signature the words " attorney in fact," from which it is argued that even at

that date he recognized the obligation of his agreement with the defendant and was purchasing for him. But the defendant never constituted the plaintiff his attorney in fact for that purpose ; on the contrary, according to defendant's own testimony, the plaintiff was to purchase and convey to him. No reason is assigned in explanation of this addition to the plaintiff's signature, but we are unable to see any connection between this fact and the alleged contract.

According to the plaintiff's story, at the time the arrangement was made for the purchase of the 200 acres, it was also arranged that plaintiff should endeavor to buy the 64 acres, and in the event of his succeeding in so doing, he would convey that tract to the defendant and the 200 acres and the 64 acres would then be equally divided, each receiving 134 acres. He denies that, beyond this, the 64 acres had anything to do with the purchase of the 200 acres, or that his right to have the portion of the 200 acres for which he paid was in any way conditioned upon his obtaining title to the 64 acres. We have already found as a fact that no executory contract existed between the parties with reference to the 200 acres, but that they by mutual consent made a joint and equal purchase. Why then should Staib, as part of that arrangement, consent to purchase with his own money a tract of coal which was not up for sale and bind himself to convey it to Hayes at a fixed price, under the penalty of a forfeiture of all his rights in the original purchase in case of a failure? What did Hayes agree to give in exchange?

If the facts had been as stated in the defendant's affidavits, there would be some reason for the plaintiff making this agreement, but in the face of all the facts and circumstances as we have already found them—the open sale ; the fact of the parties being the only bidders ; and the fact of the proposal coming from the defendant—such an agreement could hardly have been made by a person not devoid of reason. The "inherent improbability " of the plaintiff having made this a condition precedent to his obtaining the benefits of his purchase is so glaring as to put the story beyond belief. On the other hand the arrangement as detailed by the plaintiff has some semblance of business sense about it. [We find therefore, under all the facts and circumstances of the case, that the plaintiff's right to de-

mand a division of the 200 acres was in no way dependent upon his conveying the 64 acres to the defendant, but that the arrangement in regard to the 64 acres, if it rose to the dignity of a contract at all, was independent of the purchase of the 200 acres and formed no part of the consideration which entered into the arrangement for that purchase.] [5]

As we shall see when we come to the next branch of the case, the defendant has rendered it impossible for the 200 acres and the 64 acres to be equally divided and [we accordingly find that the plaintiff is entitled, upon paying the balance of his half of the purchase money, to an equal partition of the 200 acres, and that the division line should be the line A. B. on plaintiff's map, the direction and length of which is north $6\frac{1}{4}°$ east, 3,794 feet, and that all of the 200 acres lying east of that line should be conveyed by the defendant to the plaintiff.] [6]

2. The next general question to be considered is, what injuries has the plaintiff suffered by reason of the wrongful acts of the defendant and what damages or compensation should be allowed him on account of the injuries. These injuries, as charged by the plaintiff, are, (1) the amount of coal taken by the defendant from the 200 acre tract beyond his own proper proportion; (2) the damages inflicted upon the plaintiff by reason of the defendant having mined across the line A. B., into the east half of the 200 acre tract; (3) the amount of coal taken out of the Victory works by the defendant and the damages done to the property thereby; (4) the amount of coal taken out of the 64 acres, whether taken rightfully or wrongfully, and the damage done to that tract by the wrongful acts of the defendant therein.—

The master then proceeded to ascertain from the evidence the amounts of coal mined out and removed from the 200 acre tract east of the line A. B.; from the 64 acre tract; and from the 97 acre tract, with the injuries done to the plaintiff resulting therefrom, and recommended a decree, in substance: (1) That the defendant execute and deliver to plaintiff a deed in fee simple with special warranty for the one half of the 200 acre tract lying east of the line A. B.; (2) that he pay to the plaintiff $22,250.48, less the sum of $1,908.53, the balance of

purchase money on the 200 acre tract due from the plaintiff, the balance payable by the defendant being $20,341.45; (3) that he account for the coal mined and removed from the 64 acre tract after April 17, 1882; (4) that he be enjoined, etc.; (5) that his cross-bill be dismissed, and (6) that he pay the costs.

Various exceptions filed to the foregoing report were overruled by the master and being filed with his report were renewed in court. These exceptions were, inter alia, that the master erred:

1-5. In the several findings embraced in [ ]² to 6

On January 17, 1888, the day of the argument of said exceptions before the court, the defendant, subject to plaintiff's objection as to the time, filed demurrers to various parts of the bill, and assigned as reasons the want of jurisdiction in equity and the existence of an adequate remedy at law. He filed also pleas to the jurisdiction, one of which was as follows:

The defendant . . . . . doth plead to so much of plaintiff's bill as may be held to be a claim to set up and establish a resulting trust in his behalf to an equal undivided half part of the 200 acre tract of coal, and for the enforcement thereof by division of said land and a deed from defendant for an equal half thereof, as set forth in 1st paragraph of the bill, and the 4th prayer, and for a plea saith that he, the defendant, during the year 1877, when as alleged by plaintiff and found by the master the said resulting·trust commenced, and continuously, for many years next preceding that year and continuously since then, was and has been a resident of Allegheny county, in the state of Pennsylvania, and has never resided in the county of Washington.¹¹

After argument, the court, McILVAINE, P. J., filed an opinion which, after overruling the demurrers and pleas filed on January 17, 1888, on the ground that they were not in time; sustaining the jurisdiction, under Adams' App., 113 Pa. 455; Allison's App., 77 Pa. 225; Equity Rules, § 129, and reviewing the facts disclosed by the pleadings and testimony, proceeded:

These established facts taken alone would lead inevitably to

the conclusion that the original purchase of the two hundred acres of coal was a joint purchase, and, unless there are other facts in the case relevant to the transaction that would modify or annul the force of these established facts, we must so find. The fact that this sale was reported by the trustees in the name of the defendant, and the fact that since issue has been joined in this case upon the plaintiff's bill, he has paid the last one third instalment of the purchase money and obtained a deed in his own name for the whole of the tract, cannot affect the original contract or the rights of the parties under it. The plaintiff's beneficial interest in the coal land had vested in virtue of the terms of the contract of purchase and the payment of his share of the first two instalments of the purchase money, and the relative rights of the parties remain the same notwithstanding the trustee's deed was made in the defendant's name alone.

The defendant, however, sets up the claim that the plaintiff was only to have an interest in the two hundred acres of coal on condition that he would purchase and have deeded to him the sixty-four acres of Wickerham Reserve coal, and that having failed to do this he is not entitled to have a partition of the two hundred acre tract. The testimony, in our opinion, does not sustain this claim.

The original agreement of these parties in regard to the purchase of the Robison coal was made under circumstances that prevented them from going into details. They had to act promptly, and the terms of the contract were not stated at length and explicitly. We must, therefore, from all that was thus hurriedly said and done, endeavor as best we can, to arrive at the true intention of the parties at the time the contract was made and if possible exclude from the testimony, in our consideration of the matter, what appears to be an afterthought on the part of either of the parties. We have carefully read and studied the testimony with a view of ascertaining what was in the minds of the parties when they came to an agreement on the day of this sale, and our conclusion in regard to the 64 acres of Reserve coal is this: that its purchase was to be an after-consideration; the two hundred acres were then up for sale and they must act in regard to it immediately; the sixty-four acre tract belonged to another person and was not then in

the market; the proposition to buy it, we think, arose out of the suggestion of the defendant that it might turn out that more than half of the two hundred acre tract lay on Staib's side of an appropriate dividing line, and that he would not get as much coal as Staib or would not get coal that was favorably located in reference to his river front, and that thus he would .fail to realize as much out of this joint-purchase of the two hundred acres as the plaintiff. Staib then proposed that he would buy, or could buy, the sixty-four acres some time in the future and that it and the two hundred acres could be divided so as to give each an equal amount of coal well located with reference to their front coal. The purchase of the Wickerham coal was proposed by Staib to quiet the fears of Hayes that he would not get an advantageous division of the two hundred acres on account of its location, which he knew nothing about.

Still another question on this branch of the case demands our attention. Granting that the plaintiff and defendant are joint-owners of this two hundred acre tract, how ought it to be divided between them?

Each of these parties, on the day of sale, had an equal chance of buying the whole tract, and an unqualified proposition not to bid one against the other, but that they buy it together and divide it, would imply that it was to be divided into equal parts; and each party, after the purchase, paying one half the purchase money, so far as it was paid by them jointly, would greatly strengthen this implication.

The plaintiff testifies that the agreement in regard to the division of this tract of two hundred acres, was that it should be divided into equal parts, he taking the half in the rear of his coal plant and the defendant taking the half in the rear of his. And his testimony in this regard is in perfect accord with the presumption that arises from the facts connected with the purchase and the payment of the purchase money. The defendant, however, claims that the two hundred acres was to be divided by the prolongation of the division line between the tracts of front coal belonging to the parties respectively, which if prolonged without deflection would give him one hundred and sixteen acres and the plaintiff eighty-four acres. It is probable that the parties did agree, as the defendant claims,

that the two hundred acres should be divided by a prolongation of the line dividing the front tracts; that is, that it was to be divided so that each river tract should have in its rear one of the parts adjoining it; but this did not rebut the idea of an equal division.

The defendant testified that he had never been upon this two hundred acre tract of land, that he did not know but that the most of it lay on the Staib side, if the front division line was prolonged straight through it without a deflection. Why, then, would he make such a contract when it might prove to be unfavorable to himself. Not knowing as much about the lay of the land as Staib, he, as a prudent business man, would likely insist on an equal division rather than on a manner of division the result of which he could not foresee.

[From the testimony in the case and from all the facts surrounding the transaction, I am satisfied that the agreement and the understanding of the parties at the time the two hundred acres of coal was bought, were, that it should be bought by them jointly and equally divided ; that Staib was to make an effort to buy the Wickerham coal at the same price per acre, and if he succeeded, that the two hundred and sixty-four acres were to be divided equally, the division line in either case to be a straight line starting at the south terminus of the line dividing the two river tracts.] [1]   But we are also satisfied that the agreement to jointly purchase the two hundred acres of Robison coal was a contract entirely independent of the understanding or proposal in regard to the future purchase of the sixty-four acres from Wickerham. In view of these facts and conclusions we think that the master was clearly right in finding, " That the plaintiff is entitled, upon paying the balance of his half of the purchase money, to an equal partition of the two hundred acres and that the division line should be the line A.'B. on plaintiff's map, the direction and length of which is north six and one fourth degrees, east 3,794 feet, and that all of the two hundred acres lying east of that line shall be conveyed by the defendant to the plaintiff."

What the master has so well said in his report in support of this finding renders it unnecessary for us to elaborate on this branch of the case or to go into a detailed review of the testimony.

3. As to Damages.

 *   *   *   *   *   *   *   *

The court reviewing the testimony as to the damages sustained by the plaintiff, modified the finding of the master upon that subject and upon the liability of the defendant to account for the coal mined and removed from the 64 acre tract after April 17, 1882, and signed the decree as recommended by the master, except as so modified. Whereupon the defendant took this appeal, specifying that the court erred, inter alia:

1. In the part of the opinion embraced in [ ] [1]

2–6. In overruling the defendant's exceptions. [2 to 6]

11. In overruling defendant's plea to the jurisdiction. [11]

*Mr. H. Burgwin* and *Mr. M. C. Acheson* (with him *Mr. A. W. Acheson*), for the appellant:

1. The courts of Pennsylvania do not have general jurisdiction in equity, but only such as has been committed to them by statute. Section 15, act of June 14, 1836, P. L. 632, providing that " whenever any trust shall arise by operation or implication of law, the Court of Common Pleas of the county in which any such trustee shall have resided at the commencement of the trust, . . . . . shall exercise the jurisdiction and powers given by law in regard to such trusts," gives jurisdiction for the establishment of an implied or resulting trust, only in the court of the county where the trustee resided at the time when the alleged trust arose. But even if this were not so, then certainly the plaintiff's remedy, if he had one, was by application to the Orphans' Court of Washington county, where the matter was still pending, and which he could have asked to interfere and to establish his claim to be an equal joint purchaser, and as such to receive a joint deed with the defendant on paying or securing his portion of the three instalments of purchase money: Peoples' Bank App., 93 Pa. 107. Moreover, a person not a tenant in possession but having a right to dig ore, does not commit waste or trespass in digging out more ore than his right calls for, and a court of equity cannot restrain by injunction, nor will a court of equity decree an account where an account is a mere matter of charge on one side ; a bill in equity is not a universal panacea: Grubb's App., 90 Pa. 228. The second and third claims of plaintiff's

bill presented no case of equity jurisdiction, and this court has dismissed a bill suo motu upon similar grounds: Grubb's App., supra, 235.

2. The defendant's title at the time the first bill was filed, was an inchoate judicial title. He had a return of sale to him in his own name, a confirmation thereof by the court, and a deed filed in escrow by Wickerham to him, conveying the legal title then outstanding. At the time the cross-bill was filed, the testimony taken and the master's report filed, he had the entire title to the 200 acre tract, having received Wickerham's deed and also that of the trustee. Deeds are prima facie evidence of the verity of their contents, and, when supported by the positive answers of defendants, the testimony to set them aside ought to be so clear and explicit as to leave scarce a doubt upon the subject: Farringer v. Ramsey, 2 Md. 365; Bird v. Styles, 3 Green, C. E., 298; Brent v. Smith, 5 Green, C. E., 199; Calkins v. Landis, 6 Green, C. E., 423; Force v. Dutcher, 3 Green, C. E., 401. The plaintiff having appealed to the conscience of the defendant may not attack his credibility; he must overcome the answer by stronger testimony: Vandegrift v. Herbert, 3 Green, C. E., 466; Clason v. Morris, 10 Johns. 542. The testimony of two disinterested persons, or the equivalent, is required to make out a case against the answer: Thomas v. Loose, 114 Pa. 35; Campbell v. Patterson, 95 Pa. 447. Moreover, in a case for the enforcement of a resulting trust, the rule as to the strength of the testimony required is the same as in other cases to set up a parol agreement against a legal or paper title: McBarron v. Glass, 30 Pa. 133; Best v. Campbell, 62 Pa. 476; Earnest's App., 106 Pa. 310; McGinity v. McGinity, 63 Pa. 38; Buchanan v. Streeper, 11 W. N. 434; Peebles v. Reading, 8 S. & R. 493; Bigley v. Jones, 114 Pa. 517; Boyd v. McLean, 1 Johns. Ch. 582; Botsford v. Burr, 2 Johns. Ch. 405.

*Mr. H. M. Dougan* (with him *Mr. Boyd Crumrine*), for the appellee:

1. The objects sought to be obtained by a bill in equity are to be ascertained from the prayers it contains: Skilton v. Webster, Brightly, 233. The trespasses complained of were permanent in their character, and a destruction of the freehold;

the prayer for injunction was therefore proper: Allison's App., 77 Pa. 227. When trespasses are constantly recurring and threaten to continue, it is well settled they may be redressed in equity by injunction: Stewart's App., 56 Pa. 422; Smith's App., 69 Pa. 474. Jurisdiction in equity depends not so much on the want of a common law remedy as upon its inadequacy, and its exercise is a matter which often rests in the discretion of the court: Bierbower's App., 107 Pa. 17; Brush Elec. Co.'s App., 114 Pa. 585; Bank of Kentucky v. Schuylkill Bank, 1 Pars. 220; Skilton v. Webster, supra; Bank of United States v. Biddle, 2 Pars. 31. Equity has jurisdiction in all cases of partition: Section 3, act of March 17, 1845, P. L. 160; act of February 14, 1857, P. L. 39; Brown's App., 84 Pa. 457. And if for any reason, injunction, partition, or discovery and account, equity would take cognizance of this litigation, the court will dispose of every subject embraced within the circle of contest, whether the question be of remedy or of distinct yet connected topics of dispute: McGowin v. Remington, 12 Pa. 63; Winton's App., 97 Pa. 385. At all events, if the bill was demurrable, the fact ought to have been ascertained and the demurrers filed before the defendant filed his cross-bill and before there had been a tedious and expensive hearing upon the merits: Socher's App., 104 Pa. 619; Adam's App., 113 Pa. 455.

2. A trust is where the legal title is in one person and the beneficial interest is in another. When the plaintiff's bill was filed, the defendant certainly had not the legal title to the 200 acre tract. He and the plaintiff had a joint equitable title to the extent they had paid the purchase money, which payment had been equal. Hence there can be no question of implied trust in the case. Such a trust is only raised from fraud in obtaining the title, or from payment of the purchase money when the title is acquired: Barnet v. Dougherty, 32 Pa. 372; Cross's App., 97 Pa. 474; McLaughlin v. Fulton, 104 Pa. 170.

3. No argument is needed to show that § 15 of the act of June 14, 1836, P. L. 632, was but intended to give the Common Pleas of a county, other than that in which trust property is situate, power to regulate the official conduct of the trustee; and, even if the act were applicable, the defendant had submitted to answer the plaintiff's bill, filed in Washington county, and had himself filed a cross-bill against the plaintiff

in that county. And why, for any reason, should the plaintiff forsake the Common Pleas in equity and go into the Orphans' Court? In its sphere, the Orphans' Court is a court of equity, but it has not power to enjoin against repeated and continued trespasses, nor can it compel a wrong-doer, to discover and account for property which he has appropriated.

4. It is patent from the pleadings that the parties had some agreement as to the ownership of the 200 acre tract. That is shown by the defendant's answer as well as by his cross-bill. The master found: "It could not, therefore, have been what the defendant's answer and cross-bill would seem to indicate, a parol agreement by the defendant to sell and convey to the plaintiff, but it was, and the master so finds from all the evidence, an agreement to make a joint purchase of the land for the use and benefit of both parties." The defendant did not except to this finding. The master then goes into an inquiry and concludes that the plaintiff's version, that they were to be owners of equal interests, is the true one. Nothing but very clear error will justify setting aside this finding approved as it was by the court: Burton's App., 93 Pa. 220; Kisor's App., 62 Pa. 435; Reeser's App., 100 Pa. 79. The array of facts upon which the conclusions of the court and master are based is overwhelming.

OPINION, MR. JUSTICE CLARK:

This is a bill for partition; there are prayers for discovery, for an injunction, for an account, and for other specific relief, but these are incidental only to the principal prayer of the bill, which is for partition. The plaintiff claims that although the written title is in the name of W. S. B. Hayes alone, the defendant and himself are the equal owners in common of the two hundred acres of coal land described in the bill, a trust having resulted in his favor as to the one half thereof, from payment by him of one half of the purchase money; and that being so entitled in equity to an undivided moiety of the land, he is entitled to partition, as well as to the further relief prayed for in the bill. The defendant, admitting the existence of an agreement between himself and the plaintiff with reference to this land, claims that it was a conditional agreement; that the condition upon which it was to have effect

was never complied with; that the plaintiff has no title and therefore cannot have partition.

The plaintiff in partition must show title in order to sustain an action of partition; this rule applies whether the proceedings are at law or in the equity forms. The general rule however is, that a suit in partition cannot be made the means of trying a disputed title: when the proceedings are in the equity forms the bill may be retained for a reasonable time until the title has been settled at law, otherwise it will be dismissed. But this rule in the equity practice would seem to apply only to the legal title; in cases of equitable estates and defences, chancery will take jurisdiction of the whole matter: Adam's Eq. 230; Story's Eq. J. 661. An equitable estate is sufficient in Pennsylvania to support a partition even at law; it is sufficient to show a clear, equitable right to the relief prayed for: Willing v. Brown, 7 S. & R. 467; Longwell v. Bentley, 23 Pa. 99. If the disputed titles are equitable, courts of equity will exercise jurisdiction to settle them, and will then grant final relief by way of partition under the same bill: Pomeroy's Eq. 1388. Such a bill is not multifarious, because the partition is decreed incidentally, to complete the measure of relief and avoid multiplicity of suits. Under these circumstances, however, the bill should be so framed as to disclose its real object.

Vague and general as the averments of the bill are, it is plain that the plaintiff's claim, in the first instance, is in effect an attempt to establish a resulting trust, and upon the footing of that trust to have partition. It is contended, in the first place, that the Common Pleas of Washington county has no jurisdiction to establish or declare the trust, and therefore has no jurisdiction of the partition; that if this were not so, the plaintiff might accomplish by indirection what could not be done directly; that a trust, if any is shown to exist, having arisen "by operation or implication of law," by the 15th section of the act of June 14, 1836, P. L. 632, the Court of Common Pleas of the county in which the trustee resided at the inception of the trust alone has jurisdiction, and that as W. S. B. Hayes, the alleged trustee, at the time resided in Allegheny county, the proceeding to establish it must be instituted in that county. This contention involves an entire mis-

conception of the purpose and meaning of the act of 1836. That act, if it has any application to a trust created under the circumstances here alleged, has no application to proceedings at law or in equity in respect of the title; it refers rather to the control and management of the trustee, where the trust has been created by deed or will, or has been otherwise established. In 1836, and for twenty years thereafter, ejectment was the only means by which a trust might be asserted against the holder of the legal title; and that, being a local action, was necessarily brought in the Common Pleas of the county where the lands were situated. It is absurd to suppose that the legislature intended that an ejectment might be brought in one county to recover the possession of lands lying in another county.

We have no doubt as to the jurisdiction of the Common Pleas of Washington county, in equity, to hear and determine the question as to the existence of this trust, and if the demandant be found to have title under it, to award a partition; to establish the trust, however, the evidence must be clear, explicit, and unequivocal, such as would satisfy the conscience of a chancellor: Plumer v. Guthrie, 76 Pa. 441; Lloyd v. Lynch, 28 Pa. 419; McGinity v. McGinity, 63 Pa. 38.

That there was some agreement between the parties with reference to the purchase of this land at the time of the Orphans' Court sale, upon which a part of the purchase-money was then and afterwards paid by each, is conceded, but what that agreement was is the matter most in dispute. The agreement of itself is nothing, of course; under the act of 1856 an express trust cannot exist by parol; if any trust was created, it must be implied from the payment of the purchase-money. The agreement is only important as it exhibits the purpose of the parties with reference to the payment; that is to say, by the agreement it may appear that the money was applied, not as a loan, but in the purchase of the lands, or of some particular estate or specific interest therein, or of some designated part thereof; but the trust arises, if it arise at all, from the payment of the money at the inception of the title. "No oral agreements and no payments before or after the title is taken will create a resulting trust, unless the transaction is such at the moment the title passes that a trust will result from it:" Perry on Trusts, 133.

In this case it is conceded that ten per cent of the purchase-money was paid in equal portions by the parties on the day of the sale; that afterwards, and before the deed was executed, the balance of the first payment and the whole of the second payment were in like manner paid in equal portions, and that after this bill was filed, on the delivery of the deed to Hayes, he paid the remaining one third of the purchase-money, excepting a small portion reserved under an order of the court to secure the dower of Robison's widow, although Staib has at all times been ready and willing to pay his proportion of this last payment, if opportunity had been given him to do so.

The principal question of dispute is as to the footing upon which the money was paid. The plaintiff alleges in the bill that he was a purchaser of the land equally and in common with the defendant, and that as his money was applied in payment of the one half of the first two instalments, in pursuance of the parol agreement to that effect, a trust results in his favor for the undivided half of the land, upon payment by him of the one half of the remaining instalment, which payment he avers he is ready to make. The answer of the defendant is a direct and positive denial of this, and being responsive to the bill, the burden of proof is upon the plaintiff to sustain his version of the transaction by the evidence of two witnesses, or of one witness and corroborating circumstances equivalent to the testimony of a second witness. The plaintiff having been called as a witness testified substantially in support of the bill, but he was not sustained by any other witness, and the only matter, by way of corroboration, which we have been able to find in the evidence, is the presumption which is supposed to arise from the fact that the parties contributed equally to the payment of the first two instalments of the purchase-money.

Upon this branch of the case the learned master says: "The fact that the plaintiff paid the half of the purchase-money, and that the defendant permitted him to do so, is strong evidence that it was the contract that he should so pay, and the master finds as a fact established that such was the contract.

"Other circumstances relied upon by the plaintiff to sustain his version of the contract have already been found as facts, viz.: the sale was an open public sale, the two parties were the only competing bidders for the property, and the purchase of

the property was a joint purchase. Neither party then had anything to give or anything to receive as between themselves; each stood on an equal footing; each wanted the property, or was willing to take a part of it, at as low a figure as possible. There was therefore no reason why either should enter into an agreement by which he might eventually be compelled to pay for one hundred acres of coal and only get eighty or eighty-five. The only consideration for their agreement was mutual abstaining from bidding, and this was as much for the benefit of one as of the other.

"The master is of the opinion that this testimony and these circumstances together come up to the full measure of proof required by the rules in equity, and unless overborne by the evidence for the defence, will sustain the position of the plaintiff upon the point under consideration."

If we enter into an analysis of this finding of the master and the reasons assigned for it, and discard from our consideration all of the circumstances stated which really have no bearing upon the question one way or the other, it is plain there remains in support of the plaintiff's case his own testimony alone, corroborated by the single circumstance that all the purchase-money which had been paid at the filing of the bill was paid by the parties in equal portions.

On the part of the defendant, we have not only his answer, which is responsive to the bill, but we have his testimony in direct denial and contradiction of the plaintiff, and that testimony corroborated and supported at the very point of difficulty by the testimony of two entirely disinterested witnesses, who have not been impeached and whose statements are wholly uncontradicted by any witness other than the plaintiff himself. The defendant testifies, in substance, that in no event was Staib to get more of the two hundred acres than would be found to lie above the extension or prolongation of the line between the Victory Works and the Robison Front, and he was only to have that upon paying a proportional part of the purchase-money, and procuring for Hayes an agreement from Wickerham for the conveyance of the Reserve tract, at the same price per acre paid for the two hundred acres.

In this statement he is fully corroborated in the testimony of Thomas S. Hutchinson, who was actually present and par-

ticipated in the transaction involving the purchase of the land. Mr. Hutchinson testifies, that he attended the Orphans' Court sale with and in the interest of Hayes; that whilst the sale was in progress Staib said to him all he wanted was that the line between the Robison and the Victory tracts should be extended through the two hundred acres, and that he wanted only that portion back of the Victory Works to the prolongation of that line. He said he could buy the Reserve tract of sixty-four acres and have it deeded to Hayes, and that he would do that; then there would be plenty for both. Mr. Hutchinson brought the parties together; he says the matter was talked over between them in his presence, and that it was then and there agreed and well understood that Staib would have the sixty-four acres conveyed to Hayes; the price was not definitely fixed, but Staib said that he could get it at the same price per acre the two hundred acres would sell for at the Orphans' Court sale, and that the Victory line should be extended straight through the two hundred acre tract; that after this agreement was concluded, the two hundred acre tract was knocked down to Staib at $76 per acre, but he directed the title to be made to Hayes in pursuance of the agreement between them. It may be fairly inferred from the facts stated on either side, that each party was to pay for the lands he acquired under the arrangement, whatever that arrangement may be.

Hutchinson further testifies that a month or more after the purchase of the land, he was riding in a buggy with one Brokaw, and they met Staib: "Staib said, 'Tom, I wish you would see Mr. Hayes and get a small paper for my interest in that coal, so I can show it in bank;' I said, there was no need of it; 'you get a deed for the sixty-four acres and have it deeded to Mr. Hayes, and we'll continue the line through straight, as we agreed to;' he said, 'That's all I want, and it's the only way it can be done;' there was only a few words spoken. About nine or ten days after that interview I was going home and Mr. Staib was coming up the road; he was coming on the left-hand side. Mr. Staib brought up the same subject; he said, 'Tom, I wish you would get Mr. Hayes to give me a little paper to show I have paid some money in there;' I said, 'get the sixty-four acres from Wickerham as you agreed to;

get it at $76 an acre, the same price you said you could get it for; you said you knew you could, and have it deeded to Mr. Hayes, then we will continue the line straight through the two hundred acres as we agreed upon;' says he, 'All right, I can get it and will have it done;' now there was no temper, only a matter of business, and pleasantly talked over."

Mr. Brokaw, being called, testified to the conversations between Staib and Hutchinson on these occasions referred to by Hutchinson, substantially as stated by Hutchinson himself. Mr. Brokaw, referring to the last conversation related by Hutchinson, says : " Mr. Staib was in his buggy, going home ; we met not many yards from the same place, and the same conversation started again in regard to settling the difficulty.   Mr. Staib said, ' We can just as well settle that as not among ourselves ; there is no use going to court about it;' Mr. Hutchinson says, 'Yes, we will settle it just exactly as we agreed to on the ground ; you get the titles of the Wickerham Reserve coal made in Mr. Hayes's name and we'll spare no time in settling it;' 'Well,' says Mr Staib, ' we'll settle it in that way ; I can get the titles and we'll settle it in that way;' Mr. Hutchinson said, ' Well, we agreed to run that Victory line straight through;' Mr. Staib said, ' That's the only practicable way it can be done, and I am willing to do it;' and says he, ' We'll get Mr. Hayes, and all go together, and we'll settle this among ourselves.'"

What this " difficulty " was does not distinctly appear, but it does appear that Staib wanted some written acknowledgment by Hayes that his money had been applied in the purchase, and declaring his interest in the land; this Hayes would seem to have refused until Staib should secure the title to the sixty-four acres, according to his agreement; as there is no evidence of any other disagreement between them at this time, we may well suppose this was the difficulty referred to.

In September, 1880, Staib, by articles of agreement contracted with Wickerham for the sixty-four acres ; the articles are not printed, but by the deeds which were executed in October, 1883, it appears he paid $100 per acre and it is conceded he signed the agreement as " attorney in fact."   Although he was not attorney in fact for Hayes, it does not appear that he was attorney in fact for anybody else, and it is certainly a circumstance in the case not wholly irrelevant, that,

having this arrangement with Hayes, he bought the land for somebody other than himself, without disclosing who that was, and afterwards took the deed in his own name. The fact remains, however, that he is now and for five years has been the owner of the sixty-four acres, and has not at any time offered to convey to Hayes, either upon the terms of the agreement, as he states it himself, or as it is stated by Hayes, or upon any other terms.

The only fact in corroboration of the plaintiff's testimony, as we have said, is the payment by the parties equally of the first two instalments of the purchase-money; but this fact is altogether consistent with the theory of the defendant, for it was not then known precisely where the prolongation of the Victory line would lead or whether it would work an equal division of the tract or not; but Staib, who was more familiar with the ground, may well have supposed that a division according to that line would be approximately equal, and that his exact proportion of the purchase-money might be adjusted on the last payment. Whether the trust was for the undivided half of the land or was for a particular or designated portion thereof in severalty, upon the terms stated by the defendant, is for the plaintiff to establish; the party who seeks to fasten a trust upon the legal title to land takes the burden of establishing it, and all the essential requisites of that trust must be shown by clear, explicit, and unequivocal proof: Earnest's App., 106 Pa. 310. When the answer to a bill is responsive, it must, as we have already said, be supported by the testimony of two witnesses or by one witness and corroborating circumstances equivalent to another. Under the peculiar facts of this case, as alleged on one side and the other, we cannot agree that the equal payment of a part of the purchase-money only is a circumstance equivalent to the testimony of another witness; for that fact seems to be quite as consistent with one theory of the case as the other.

This court will not reverse the finding of a master, after it has had the approval of the court below, except for clear error, but we think the proof of a trust for the undivided one half of this land was not up to the required standard; and besides, the weight of the evidence is undoubtedly against it; the theory of the defendant is clearly established by the proofs, and the master should have so found. The plaintiff has shown

no title to the two hundred acres in common with the defendant, and, therefore, cannot have partition. If he is entitled to any interest in that land, his interest is in severalty and is confined to that portion of the tract above the prolongation of the Victory line. The plaintiff has obtained and now holds the title to the Reserve tract of sixty-four acres; he holds it in his own right and for his own use; he has not offered and does not now offer, upon being reimbursed for his outlay, to convey it to Hayes. He cannot complain, therefore, that Hayes declines to recognize his equity to any part of the land; for it is a fundamental principle or maxim that he who seeks equity must do equity; the court can give to the plaintiff the relief to which he is entitled only upon condition that he has given, or is ready and willing to give, the defendant such corresponding rights as he may be entitled to in respect of the subject-matter of the suit.

The plaintiff has shown neither title to nor possession of the lands described in the bill, and of which he prays to have partition. The possession of one tenant in common, even though he be in the exclusive receipt of the profits, may be, and as a general rule is, treated as the possession of all for the purposes of a partition; the possession of one is the possession of all, unless by an actual ouster, or an exclusive pernancy of the profits, against the will of the others, one shall manifest a clear intention to hold the land adversely and in hostility to the common right. In this case it is clear that Staib has never had, nor does he pretend to have, any possession of the premises; indeed, Hayes has admittedly been in the exclusive occupancy of the lands and pernancy of the profits ever since his purchase, and, at the filing of the bill, held in open and avowed hostility to the plaintiff. Having shown no title nor possession the plaintiff is certainly not entitled to a partition, and upon the same ground it is plain that his prayers for a discovery for an account, for an assessment of damages, and for other relief, must also be refused. For the recovery of such damages as he may have sustained by reason of the defendant's invasion of the Victory Works, or for mining in the Reserve tract in excess of his rights, the law affords an adequate and proper remedy.

The decree is therefore reversed, and the bill dismissed at the cost of the appellee.