ROYSTON v. MILLER et al.

(Circuit Court, D. Nevada. August 24, 1896.)

No. 587.

1. MINING CLAIM—LOCATION—WORK ON CONTIGUOUS CLAIMS.
 The provision of Rev. St. § 2324, authorizing the necessary work to be done on any one of several claims held in common, applies only when such claims are contiguous.

2. SAME—RIGHTS OF CO-OWNER—FRAUD.
 A co-owner of several mining claims, who undertakes to do the work necessary to hold such claims, and reports to his co-owners that he has done such work, cannot acquire any interest therein as against his co-owners because of the failure to do such work.

3. SAME—FORFEITURE—VESTED RIGHTS.
 Act Nov. 3, 1893, provided that Rev. St. § 2324, as to the doing of labor or making of improvements on a mining claim, should be suspended for the year 1893, and that any failure in that regard should not cause a forfeiture. *Held*, that a co-owner, who had done the necessary work, had no vested right to contribution from his co-owner or to forfeiture in lieu of contribution, which could not be affected by the act.

4. MISTAKE—IGNORANCE OF CONTENTS OF INSTRUMENT.
 Ignorance by a party to an instrument of the contents thereof does not relieve him from its legal effect, in the absence of fraud or misrepresentations.

5. PARTITION—EQUITABLE TITLE.
 Where one co-owner of property brings suit for partition, it is immaterial whether he has a legal or equitable title, and in either case he is entitled to the same relief.

6. PARTITION SUIT—DECREE.
 As between a sale and a partition, the courts will favor the latter.

David S. Truman, for complainant.
Trenmor Coffin, for respondents.

HAWLEY, District Judge (orally). This is a suit in equity for an accounting and for partition of a group of mining claims known as the "Kingston Mines," situated in Victorine mining district, Lander county, Nev., and of the "Irvine Tunnel," run for the purpose of prospecting and developing said mining claims. This group consists of four different claims, known as the "Provider," the "Morse," the "California," and the "Chicago." The first three are contiguous. The Chicago is separated from them by the "Victorine," a patented mining claim owned by other parties. Prior to October, 1891, George E. Spencer and J. C. Irvine were co-owners of the property involved in this suit. During that month, Spencer conveyed to his wife, Mrs. William Loring Spencer, his entire interest in the property. On September 1, 1893, Mrs. Spencer conveyed her interest therein to complainant. The interest of defendant Miller is in the nature of a trustee for the defendant Irvine.

There is a controversy between the parties as to their respective interests in a portion of said property, and also upon the question as to whether the property can be divided without material injury. But the defendants contend that the grantors of complainant forfeited all their rights to the property by a failure on their part to perform or contribute their proportion of the assess-

ment work upon said claims for the year 1893, and especially of the Chicago claim for the year 1892. This question of alleged forfeiture will be first considered. The evidence shows that the co-owners, from the year 1888, when they commenced to run the Irvine tunnel, up to 1892, performed more than sufficient work to hold all the claims each year; that during all this time, up to the time Spencer disposed of his interest, Irvine was the agent of Mr. Spencer in performing the work and caring for the property; and that Spencer relied upon and trusted him to properly do the necessary amount of assessment work upon each of said claims. In the year 1892, more than $1,000 worth of work and labor was done and performed on the Irvine tunnel; and this was done, as in previous years, for the express purpose of holding all of the claims, —the Chicago as well as the three others that were contiguous to each other. The relations existing between Spencer and Irvine, when the work was done upon the tunnel, prior to August, 1892, were friendly and fiduciary in their character. During that month, for reasons unnecessary to state, the friendly relations ceased; and thereafter Irvine, on his own account, performed the necessary amount of work on the Chicago claim to hold it for the year 1892. In 1893, Irvine did sufficient work on the Irvine tunnel, prior to November 3d, to hold all of said claims. Mrs. Spencer, who had succeeded to the interests of her husband in the property, had employed a man to work jointly with her son to do her proportion of the assessment work for that year. But, at the time the work was done by Irvine, she was engaged in attending to the crops on a ranch in the vicinity of the mines, and expressed her desire not to commence the assessment work on the tunnel until the work then being done upon the ranch was finished, and which would still give plenty of time to perform the assessment work for that year. In the meantime (after Irvine had completed the work), she learned of the passage of the amendatory act to section 2324 of the Revised Statutes of the United States, and availed herself of its provisions by complying therewith, and did not either perform any assessment work on the claims, nor contribute her proportion of the work and labor done and performed by Irvine. Irvine, having performed the necessary assessment work, published the demand and notice for contribution, as provided for by section 2324, for the period of 90 days beginning January 27, 1894, and made proof of the publication and demand, and had the same duly recorded.

Was the interest of Spencer forfeited by his failure to contribute to the assessment work done by Irvine on the Chicago claim in 1892? Did complainant's grantor forfeit her interest in the contiguous group of mining claims by her failure to do any work, or to contribute her proportion for the work done by Irvine, in 1893?

Section 2324, among other things, provides as follows:

"Upon the failure of any one of several co-owners to contribute his proportion of the expenditures required hereby, the co-owners who have performed the labor or made the improvements may, at the expiration of the year, give such delinquent co-owner personal notice in writing or notice by publication

in the newspaper published nearest the claim, for at least once a week for ninety days, and if at the expiration of ninety days after such notice in writing or by publication such delinquent should fail or refuse to contribute his proportion of the expenditure required by this section, his interest in the claim shall become the property of his co-owners who have made the required expenditures."

On the 3d day of November, 1893, section 2324 was amended as follows:

"That the provisions of section 2324 of the Revised Statutes of the United States which require that on each claim located after the 10th day of May, 1872, and until patent has been issued therefor, not less than one hundred dollars' worth of labor shall be performed or improvements made during each year, be suspended for the year 1893, so that no mining claim which has been regularly located and recorded as required by the local laws and mining regulations shall be subject to forfeiture for nonperformance of the annual assessment for the year 1893: provided, that the claimant or claimants of any mining location, in order to secure the benefits of this act, shall cause to be recorded in the office where the location notice or certificate is filed on or before December 31st, 1893, a notice that he or they, in good faith intend to hold and work said claim." 28 Stat. 6.

1. The work done upon the Irvine tunnel in 1892, as well as in the previous years, was wholly insufficient to constitute a compliance with the provisions of section 2324 as to the amount of the annual assessment work to be performed on the Chicago claim. It was only sufficient to hold the three mining claims that were contiguous, viz. the Provider, Morse, and California. Chambers v. Harrington, 111 U. S. 350, 4 Sup. Ct. 428; Mining Co. v. Callison, 5 Sawy. 440, 457, Fed. Cas. No. 9,886. The construction and policy of the statute in this respect was to require every person asserting an exclusive right to a mining claim to expend something of labor or value upon it, as evidence of his good faith.

In Chambers v. Harrington, the court said:

"When several claims are held in common, it is in the line of this policy to allow the necessary work to keep them all alive to be done on one of them. But, obviously, on this one the expenditure of money or labor must equal in value that which would be required on all the claims if they were separate or independent. It is equally clear that in such cases the claims must be contiguous, so that each claim thus associated may in some way be benefited by the work done on one of them."

Undoubtedly, a third party could have made a valid location of the Chicago claim by reason of the failure of the owners to do the asesssment work for 1892, and could have obtained a valid title thereto by a compliance with the mining laws. But the question whether one of the co-owners could, under the facts of this case, obtain any right as against the other co-owners in the claim, rests upon an entirely different principle. The necessary work was done upon the tunnel by Irvine, for himself and as agent of the others, under the mistaken idea that the work so done was sufficient to hold the four claims. Irvine reported that sufficient work had been done to hold all the claims. It was his duty to do the necessary work to hold each claim. He could not take advantage of his own wrong. By doing the extra work on the Chicago he did not gain any right for himself which he could set up against his co-owners in the claim.

In Hunt v. Patchin, 35 Fed. 816, the complainant was induced by defendant's representations to believe that the claims in which they were jointly interested would be forfeited and relocated for the benefit of all the owners. The claims were forfeited, and defendant claimed to have relocated the claims for his own benefit. Prior to the relocation he was managing the mines on behalf of himself and his co-owners. He was in a position of trust, and was bound to protect their interests. The court said:

"It was his duty not to permit a forfeiture for the purpose of relocating and acquiring the whole for himself without their knowledge and consent. * * * By his act and this breach of faith, he threw his associates off their guard, and prevented them from taking other means to protect their interests. The Civil Code of California embodies the rule as it before existed, under the common law in equity jurisprudence, and as it now exists in Nevada, without a Code, in the following language: 'One who gains a thing by fraud, accident, mistake, undue influence, the violation of a trust, or other wrongful acts, is, unless he has some other or better right thereto, an involuntary trustee of the thing gained for the benefit of the person who would otherwise have had it.' Civ. Code Cal. § 2224. * * * He stood in a confidential relation to complainant, being an associate owner, intrusted with the management of the property. His duty, certainly, was to deal fairly by his associates. In my judgment, there was fraud; also, a violation of trust."

See, also, Lockhart v. Rollins (Idaho) 21 Pac. 413.

Applying these principles to the facts of this case, it is clear that Irvine acquired no rights against his co-owners by the work done on the Chicago in 1892.

2. With reference to the work done in 1893: The contention of the defendants is that Irvine had a vested right to contribution from his co-owner upon his completion of the annual assessment work for that year, and that, such co-owner having failed to contribute her proportion, and Irvine having given the notice and demand for the required time, at the end of 90 days, thereby became the owner of the property. The contention of complainant is that, when congress suspended the forfeiture clause for nonperformance of the annual assessment work for the year 1893, no such rights to such forfeiture existed, and no forfeiture could thereafter be enforced between the co-owners for the work previously done by Irvine, and that the only remedy would be an action for contribution between the co-owners for expenditures incurred or made for the common benefit of all the owners. Which contention is correct? Under the statute as it existed prior to the amendment, the owners of mining claims had until December 31, 1893, to do the annual assessment work. It cannot, therefore, be said that any vested right to forfeiture occurred, or could occur, prior to the expiration of that time. A vested right is property arising from contract or from the principles of the common law, which cannot be destroyed, divested, or impaired by legislation. In cases where a contract is made and executed in pursuance of a statute, which also prescribes the parties against whom and the mode in which it may be enforced, the right to enforce it in the manner prescribed is a part of the contract, and is not affected by a subsequent act repealing the provisions in reference to the enforcement of the contracts authorized by the statute under which it

was made. But imperfect and inchoate rights are subject to future legislation, and may be extinguished while in that condition. At the time Irvine completed the assessment work, he did not have such a vested right of recovery by contract as prevented congress from repealing or suspending the provisions of the statute in so far as it provided for a forfeiture. The suspension of the provisions of the statute requiring annual work to be done necessarily suspended the right of forfeiture. The forfeiture imposed by the statute was for failing to do the work which the law then required to be done. The suspendatory or amendatory act provided that the work hitherto required need not be done in 1893, and hence it follows that the right of forfeiture could not thereafter exist for any act omitted in that respect during that year. The enforcement of a forfeiture cannot be had when the law excuses the performance of the condition. The general rule is that statutes providing for forfeitures must be strictly construed. They are, to that extent, analogous to penal statutes; and the rule is well settled that actions on statutes in their nature penal, pending at the time of the repeal of such statutes, cannot be further prosecuted after such repeal unless the repealing act, in terms, saves the right to prosecute pending suits. There is no such thing as a vested interest in an unenforced penalty or forfeiture. Norris v. Crocker, 13 How. 429; U. S. v. Claflin, 97 U. S. 546, 553; Railroad Co. v. Grant, 98 U. S. 398, 401; U. S. v. Auffmordt, 122 U. S. 197, 209, 7 Sup. Ct. 1182; Id., 19 Fed. 893; Bank v. Peters, 144 U. S. 570, 12 Sup. Ct. 767; Iron Co. v. Pierce, 4 Biss. 327, Fed. Cas. No. 14,367; Lamb v. Schottler, 54 Cal. 319, 325; Railway Co. v. Crawford, 11 Colo. 598, 19 Pac. 673; Railroad Co. v. Austin, 21 Mich. 390, 397; Gregory v. Bank, 3 Colo. 332, 336. In support of the text that "the repeal of a statute prescribing a penalty or forfeiture recoverable in a civil action takes away the right of recovery," numerous authorities are cited in 23 Am. & Eng. Enc. Law, 509, and it is there stated that there is no vested right in the penalty or forfeiture until recovery has been had by final judgment. It is fair to presume that congress intended the amendatory act to apply to all cases, and to release the owners from any forfeiture where the amount of annual work had been done by one of the co-owners before the passage of the amendatory act, as well as to the failure of doing the work after the passage of the amendment; otherwise, a proviso should, and doubtless would, have been inserted to the effect that the amendment should not apply to cases where the annual work had been done, so as to deprive such co-owner of the right to have the interest of his co-owner, who failed to contribute, forfeited. The amendatory act, in fact, suspended the statute for the year 1893; and, the statute being suspended, there could be no forfeiture. There being no contractual relations between the parties to be impaired by such an amendment, and no vested right having accrued to Irvine, it was within the power of congress to pass the act; and it is the duty of the court to uphold it. The contention of the defendants cannot be sustained.

3. What is the interest of the respective parties in the property?

It is admitted that each party has an undivided one-half interest in all the property except the Morse claim and the Irvine tunnel. The complainant claims to be the owner of an undivided two-thirds interest in the Morse mine and the Irvine tunnel. The defendants claim to be the owners of a two-thirds interest in the Morse mine, and of an undivided one-half interest in the tunnel. The tunnel was located in 1888, in the names of Spencer and Irvine jointly, without specifying any particular interest for either. It was located for the express purpose of being used to prospect and develop the mining claims in Kingston district, owned by the respective parties. If completed, it would reach the lode on the Morse claim. But it was not located nor run for the sole benefit of the Morse claim. There is therefore no substantial reason for holding that the interest of each in the tunnel is to be governed by their respective interests in the Morse mine. On the other hand, the equity of the disputed question calls for an equal division of the interests in the tunnel, wholly independent of the decision as to the rights of the parties in the Morse mine. In endeavoring to determine the question as to the respective interests of the parties in the Morse mine, the court is confronted by a mass of conflicting evidence, and by numerous objections made to the admissibility of certain testimony and exceptions taken by the respective parties. In addition thereto, there is shown to be much ill feeling and many charges of fraud and bad faith on both sides. But, in the main, it will not be necessary to notice the conflict in the evidence, nor to advert to any of the facts concerning the ill feeling of the parties, or to pass upon the objections made to the evidence, because there is enough in the undisputed facts to enable the court to come to a proper decision upon the controlling questions upon this branch of the case. In 1864 a location was made by Irvine and others of a claim known as the "Gold Point Lode," 1,400 feet long, and 200 feet wide, which covered substantially the ground now embraced in the Morse claim. The title to this claim was kept good until 1876, when it was abandoned, and it was that year located in the name of W. B. Morse, in order to have a claim 1,500 feet long and 600 feet wide under the act of congress. In 1881, Morse conveyed the entire claim to the defendant Irvine. In 1882, Irvine conveyed an undivided one-third interest therein to George E. Spencer. There is no dispute as to this third interest. The entire controversy as to the other one-third interest hinges upon the questions of the validity, construction, and effect to be given to a paper designated as "Exhibit B," introduced by the complainant, and certain legal points raised by counsel in regard thereto. This document mentions many mining claims and other property, and specifies different and distinct interests in the various properties therein named. It bears date, "Aurum, Nev., March 6, 1886," and, omitting the other claims mentioned therein, reads as follows:

"J. C. Irvine will deed to Geo. E. Spencer all my interest in * * * one-third of the Morse mine, at Kingston, Nevada. * * * The above-mentioned property is all in the name of Irvine, except the three last-named claims, & those Irvine has my power of attorney to deed. W. B. Morse."

Then follows:

"I accept the above order, and will deed to Geo. E. Spencer as requested, whenever he asks it.                    J. C. Irvine."

This document was recorded in the county recorder's office of Lander county, at the request of George E. Spencer, August 27, 1892. The contention of the defendants is that the insertion of the "one-third of the Morse mine at Kingston," in the document, was a mistake; that Morse at that time had no interest in the Morse mine; that the document was not read over at the time it was signed by the parties; that the claim now made is stale and false; that the document was abandoned, and never relied upon as constituting any title to any of the mining or other property mentioned therein; that it was never recorded until after the friendly relations existing between the parties were severed; and that reliance upon this instrument is an afterthought, etc. The Morse is not one of "the three last-named claims" for which Irvine has Morse's "power of attorney to deed," but is one of the mines the title to which is referred to as being in the name of Irvine. It appears from Irvine's testimony that he and Spencer abandoned their respective rights under Exhibit B in all of the mining claims therein mentioned, except the Morse claim; and that Irvine, for their joint benefit, relocated the same; and that Spencer's interests in several of the relocations were greater than is mentioned in Exhibit B. The Morse claim, however, was not relocated. Exhibit B remained in the possession of Spencer. In 1892 he demanded from Irvine a deed of an undivided third interest in the mine. Irvine refused to convey, and the document was thereupon recorded. On behalf of complainant it is shown that Gen. Spencer, after obtaining possession of Exhibit B, expended large sums of money upon the faith thereof, and that Irvine attended to the management of the property for Spencer. The fact that Spencer abandoned his rights under Exhibit B to other mining claims therein mentioned does not prove that he abandoned his interest therein to the Morse mine. He never surrendered the document. He never abandoned or destroyed it. The statute of limitations could not be said to have commenced to run until the demand was made for a deed and denied. The claim of any interest under Exhibit B cannot, in the light of all the undisputed facts, be considered stale. The mere fact that the legal title was in Irvine at the time the order was signed by Morse furnishes no excuse upon the part of Irvine for failing to execute a deed as directed by the order, he having in writing agreed to comply with the order. It is admitted by the defendants that the signatures of W. B. Morse and J. C. Irvine attached to the document are genuine, and Mrs. Spencer swears positively that she was present at the time the instrument was written and signed, and that it was read aloud by her husband, and fully explained to Morse and Irvine, and that they, with full knowledge of its contents, signed the same in her presence. The testimony of Morse and Irvine that, at the time of the signing of the document, they were unaware that any reference therein was made to the Morse mine, to have controlling

effect, should be corroborated by clear and convincing circumstances or facts. It does not seem probable that men of admitted intelligence and thorough business habits would be likely to sign such a document without knowing its contents. In Gage v. Phillips, 21 Nev. 150, 26 Pac. 60, it was held that ignorance of the contents of a written instrument upon the part of a party signing it, when neither fraud in its procurement nor falsity of any representations is alleged, will not excuse the party signing it from its legal effect. In Kinney v. Mining Co., 4 Sawy. 384, 445, Fed. Cas. No. 7,827, it was held that relief in equity on the ground of mistake in cases of written instruments will only be granted where there is a plain mistake clearly made out by satisfactory proofs. "The proof must be such as will strike all minds alike as being unquestionable, and free from reasonable doubt." 1 Story, Eq. Jur. § 157. The proofs in the present case fall far short of convincing the court that Morse and Irvine were ignorant of the contents of the instrument which they both admit they signed.

But it is earnestly argued by defendants' counsel that the order or document in question is of itself wholly insufficient to pass any title whatever to the property; that, at most, it only creates an equitable interest therein, which is not pleaded; that it only raises an equity in favor of complainant's grantors; and that complainant is not entitled to have a sale or partition of such an equitable title. No steps have been taken to compel Irvine to convey the title of this one-third interest in the Morse mine since the demand therefor was made. No relief of that character is specially asked for in the complaint. Has this court the power, under the facts pleaded, to make a decree for the sale or partition of any mere equitable interest in the property? If it has no such power or authority, is it its duty, of its own motion, to continue this suit until proper pleadings are had to perfect the legal title thereto in complainant? The broad question is presented, and must be met, whether the court, having general equitable jurisdiction in the premises, ought not to treat that as done which in equity and good conscience ought to have been done, and enter a decree accordingly? The respective parties have introduced their evidence bearing upon the question as to their respective interests in the Morse mine. The facts are therefore before the court, and, if it has the power to finally adjust and settle the matter, there is no other substantial reason that has been presented why it should not do so. The prayer of the complaint asks "for such further or other relief in the premises as the nature of the circumstances of this case may require and to this honorable court shall seem meet." The conveyance by Gen. Spencer to his wife, and her conveyance to the complainant, are of all their "right, title, and interest in the property."

The statutes of Nevada in relation to actions for the partition of real property provide that "the rights of the several parties, plaintiffs as well as defendants, may be put to issue, tried and determined by such action." Gen. St. Nev. § 3295. The pleadings in this suit raise the issue as to the rights of the respective parties

in the Morse mine, and under the provisions of the statute this issue may be tried and determined in the suit for partition. De Uprey v. De Uprey, 27 Cal. 330, 335; Morenhout v. Higuera, 32 Cal. 289, 294; Bollo v. Navarro, 33 Cal. 459. In cases of equitable titles in suits for the partition of lands, it seems now to be the settled practice for courts of equity to take jurisdiction of the whole matter, and grant full relief. 1 Story, Eq. Jur. § 653 et seq.; 3 Pom. Eq. Jur. §§ 1386, 1388, et seq.; Hayes' Appeal, 123 Pa. St. 110, 132, 16 Atl. 600; Lucas v. King, 10 N. J. Eq. 277, 280; Read v. Huff, 40 N. J. Eq. 229, 233; Jarrett v. Johnson, 11 Grat. 327; Perry v. Richardson, 27 Ohio St. 110, 120. In Crosier v. McLaughlin, 1 Nev. 348, it was held that, where one tenant in common with others brings a suit asking for a partition of property, it is immaterial whether he shows that he has a legal title in common with the defendants, or only an equitable title, and that in either case he is substantially entitled to the same relief. I am therefore of opinion that complainant is entitled to a decree for a two-thirds interest in the Morse mine.

4. The next question is whether the court should decree a sale or order a partition of the property. The statutes of Nevada provide that:

"When the action is for partition of a mining claim among the tenants in common, joint tenants, co-parceners or partners thereof, the court, upon good cause shown by any party or parties in interest, may, instead of ordering partition to be made in manner as hereinbefore provided, or a sale of the premises for cash, direct the referees to divide the claim in manner hereinafter specified." Gen. St. Nev. § 3334.

The defendants contend, and the evidence on their behalf tends to show, that the Kingston group of mines, which are contiguous, can only be economically worked through the Irvine tunnel; that this tunnel is run upon the Morse ground, near the center of the location; that it has but one track; that two companies could not work through the same tunnel; and that no division could be made that would not be detrimental to both parties. On the other hand, it is argued by complainant—and the testimony on her behalf tends to support the argument—that a division can be made without injury to the parties; that her interest would be jeopardized by a sale of the property, as she is possessed of limited means, and the defendants would be in a position to purchase the property on their own terms; and that the only practicable way to develop the property is by an incline, instead of through the tunnel. The evidence shows that it would cost in the neighborhood of $3,000 to complete the tunnel in order to reach the lode. There is no evidence as to the particular value of either of the mining locations, except that, in the opinion of some of the witnesses, the Morse is more valuable than the others. The reasons given by the respective witnesses upon these questions are of about equal weight. This being true, it is the duty of the court to follow the course which the law favors. In section 1390, 3 Pom. Eq. Jur., the question is discussed at some length, and it is there said that, "as between a sale and a partition, however, the courts will favor a partition,

as not disturbing the existing form of the inheritance." See, also, Mitchell v. Cline (Cal.) 24 Pac. 164, 166. A partition of the property will therefore be ordered.

Let a decree be drawn in accordance with the views expressed in this opinion.