No. 18,574.

WALTER HAMILTON, ET AL. *v.* TELL ERTL.

(360 P. [2d] 660)

Decided March 20, 1961. Rehearing denied April 10, 1961.

Mr. CHARLES F. STEWART, Mr. FRANK DELANEY, for plaintiffs in error.

Messrs. COLE, MINCER and LAWSON, for defendant in error.

*En Banc.*

MR. CHIEF JUSTICE HALL delivered the opinion of the Court.

THIS action was instituted by Ertl under Rule 105, R.C.P. Colo., to determine interests in sixty-seven unpatented placer mining claims located in Rio Blanco County, Colorado. The claims were known as the Pueblo Group, Cedar Group, Nancy Group and Helen Agnes Group.

Trial was to the court and judgment entered December 2, 1957, quieting title in Ertl to all claims. The defendants who appeared in the trial court are here by writ of error seeking reversal.

Several parties named as defendants in the trial court did not appear there — among others, Cathedral Bluffs Realty Trust, herein referred to as Realty Trust, and Cathedral Bluffs Oil Shale and Refining Company, referred to as Refining Company.

The parties at a pretrial conference agreed that one Chris C. Dere, by deed duly executed September 29, 1920, and recorded in Rio Blanco County, Colorado, on October 4, 1920, became the sole owner of the claims involved.

Ertl claims ownership of a one-twelfth interest in the claims by virtue of a quitclaim deed executed by one Frank Sefcik in which Ertl is named as grantee. He claims ownership of the other eleven-twelfths interest on the ground that he, being a co-owner of the claims by virtue of the aforesaid quitclaim deed, performed the annual labor and made the annual improvements on the claims for the year July 1, 1952, to July 1, 1953, and had acquired the title of his co-owners through forfeiture proceedings conducted pursuant to and in compliance with Title 30, Section 28, U.S.C.A., which among other things provides:

"* * * Upon the failure of any one of several co-owners to contribute his proportion of the expenditures required hereby, the co-owners who have performed the labor or made the improvements may, at the expiration of the year, give such delinquent co-owner personal notice in writing or notice by publication in the newspaper published nearest the claim, for at least once a week for ninety days, and if at the expiration of ninety days after such notice in writing or by publication such delinquent should fail or refuse to contribute his proportion on the expenditure required by this section, his interest in the claim shall become the property of his co-owners who have made the required expenditures. * * *."

Hamilton claims title to all of the claims, with the exception of a one-half interest in the Pueblo Group, through two quitclaim deeds executed by one G. C. Wiles (named as defendant in the complaint but did not appear), both of which deeds were dated November 22, 1934, and recorded May 17, 1935, and June 19, 1935, respectively.

Plaintiffs in error, other than Hamilton, are the heirs of Chris C. Dere. They claim ownership of all of the claims, contending that Dere at the time of his death was the sole owner of all of the claims.

From the record before us one must conclude that for a period of over thirty years no one manifested any appreciable interest in the claims which now appear to have substantial potential value. There is nothing in the record to indicate that any assessment work was done on the claims for over thirty years.

On December 1, 1920, Chris C. Dere, then sole owner of all of the claims, and one G. C. Wiles, designating themselves as "Subscribers," executed an instrument labeled:

"Express Trust and 'Hulbert Plan' Voluntary Association of Trustees by Contract under the Common Law."

In this instrument they adopted the trade name: "Cathedral Bluffs Realty Trust: Main Office, Chicago, Ill." and they, as "subscribers," purported to convey to said Realty Trust all of the claims herein involved (except twelve claims of the Pueblo Group), title thereto to be held as a trust estate by five trustees: Dere and Wiles, together with Henry Hulbert, L. A. Wiles and F. G. Hulbert. This instrument was recorded in Chicago, Illinois, on December 14, 1920. It has never been recorded in Rio Blanco County. It was signed by Chris C. Dere and G. C. Wiles, described as subscribers, by the five persons, including Dere and Wiles as trustees, and by:

"Cathedral Bluffs Realty Trust
G. C. Wiles, President
L. A. Wiles, Secretary."

Among other things, the instrument provides that the trustees shall issue 50,000 beneficial shares, each with a par value of $100.00 ($5,000,000.00), and directs that the trustees forthwith "issue or allot" said shares in "equal ratio" to Dere and Wiles in exchange for their services and the properties conveyed.

Simultaneous with the purported creation of this

Realty Trust an almost identical instrument was drawn providing for "The Cathedral Bluffs Oil Shale and Refining Company." This instrument bears the same date, the subscribers and trustees are the same and the purposes of the trusts, if any, are the same or similar. However, it dealt with the twelve Pueblo Group claims not conveyed to the Realty Trust and provided for the issuance and forthwith delivery to Dere and Wiles of 2,000,000 beneficial shares of the par value of $1.00 per share ($2,000,000.00).

The record shows that shortly after creation of these so-called "Hulbert Plan" trusts (Dere having by separate deeds conveyed to each trust the claims described therein), eleven persons met with Dere and Wiles in the Chicago office of one Frank Sefcik. At this meeting each of the eleven persons paid to Dere and Wiles $2,000.00 and in return therefore each received identical agreements signed by: "Chris C. Dere and G. C. Wiles, Subscribers of all of the assets and owners of all of the beneficial shares of Cathedral Bluffs Realty Trust * * * parties of the first part," wherein, among other things, it is provided that they in consideration of $2,000.00 in hand paid: "do hereby sell, assign, convey and deliver * * * an undivided one-twelfth (1/12) interest in all * * * mining claims [inserted is a legal description of all of the claims deeded to the Realty Trust]."

Said agreement further provides:

"It is further understood and agreed by and between the parties hereto that unless mutually agreed upon at some future date, that there will be no beneificial shares offered for sale in the said CATHEDRAL BLUFFS OIL SHALE & REFINING COMPANY and that the said party of the second part *is an owner and shall hold a one-twelfth (1/12) interest in said CATHEDRAL BLUFFS OIL SHALE & REFINING COMPANY."* (Emphasis supplied.)

Uncontradicted testimony of Sefcik shows that within a year or two after the execution of the eleven agree-

ments each of the eleven made one or more payments to Dere and Wiles of $400.00 or $500.00 to take care of the assessment work to be done on the claims.

There is nothing in the record to indicate that any trustee ever qualified, that any beneficial shares were ever issued, that any assessment work was ever done, that the trustees ever met, functioned as a group or made any accounting to anyone. From the record before us one might well conclude that the trusts existed on paper only.

On October 16, 1952, Sefcik by quitclaim deed conveyed to Ertl all of his title to all sixty-seven claims.

Ertl, during the summer of 1953, went upon the claims and expended the sum of $6,860.53 (an amount in excess of $100.00 per claim) in building roads on the claims, developing water sources and drilling of four holes for cores of the oil shale underlying the claims.

In July of 1953 Ertl, proceeding on the theory that he was a co-owner of the claims, owning a one-twelfth interest acquired from Sefcik, and having expended in excess of $100.00 in labor and improvements upon and for the benefit of each claim, caused to be published a forfeiture notice as provided by Title 30, Section 28, U.S.C.A. Any co-owner had the right to ward off forfeiture of his interest by contribution to Ertl of a portion of the total cost proportionate to his ownership. None exercised or offered to exercise this right.

The trial court found that Sefcik on February 7, 1921, in consideration of $2,000.00 by him paid to Dere and Wiles, became the owner of a one-twelfth interest in all of the claims as evidenced by the above mentioned agreement, dated February 7, 1921, and executed by Dere and Wiles. Hamilton and the Dere heirs contend that this finding is not supported by the record before us. Resolution of this question is the principal problem in the case.

We agree with the finding of the trial court. Careful analysis of the so-called trust agreement discloses the

fact that Dere or Wiles relinquished little, if anything. The agreement goes so far as to grant to Dere and Wiles, or either of them, power to veto any action taken by the majority; other trustees could be removed, but not Dere nor Wiles, not even for fraud, malfeasance or gross neglect. They even provided that they should own all of the beneficial shares of both trusts. They owned everything of value and retained control of everything. Their sale of everything except a one-twelfth interest and pocketing of the $22,000.00 received, lends emphasis to the foregoing analysis.

In conveying to Sefcik and ten others they described themselves as Subscribers of all of the assets and owners of all of the beneficial shares of the trust. No trustee appears to question their action and even if the other trustees were to do so, either Dere or Wiles could veto their action and make ineffective any such protest.

It is true that the Refining Company, owner of twelve Pueblo Group claims, does not as such purport to convey anything to Sefcik. However, Dere and Wiles, who held the same positions with the Refining Company and the Realty Trust and owned all of the beneficial interests of both, and presumably as inducement to cause Sefcik to part with $2,000.00, stated in their pre-pared written agreement that Sefcik:

"* * * is an owner and shall hold a one-twelfth (1/12) interest in said Cathedral Bluffs Oil Shale and Refining Company."

Such is not a method of conveyancing that commends itself to this court; however, the intention is clear, and such being the case the form of conveyance is not of paramount importance.

In *Scott v. Brown,* 71 Colo. 275, 206 Pac. 572, we said: " * * * It should have been registered in her and Scott as tenants in common. The contract is not a mere con-tract to convey, it is, in effect, a conveyance each to the other of one-half his or her interest. No other interpre-tation can be given to the words 'That when title is

perfected and *from this date* each consents with the other to be *equal owners* of said land.'

"This is seen by supposing a deed between these parties with all formalities — the twelve parts of the deed of conveyance — whereby each, in consideration of the act of the other, grants, bargains, sells and conveys to the other the undivided one-half of his or her interest, whatsoever that may be. The net result of such a formal deed would be exactly what is expressed in the above quoted clause, 'each consents with the other to be equal owners of said land.' Nothing essential to a conveyance is lacking. No particular form of words or formality is necessary to pass the title to real estate [citing cases]. The intent manifested by the instrument controls. * * *."

See, also, *Simson v. Langholf,* 133 Colo. 208, 293 P. (2d) 302.

We conclude that Ertl, having acquired the interest of Sefcik in the claims, was a *co-owner* and as such had the right to do the assessment work and proceed with the forfeiture.

Counsel for Hamilton and the Dere heirs contend that the forfeiture proceedings are void and of no effect even if Ertl was a co-owner. They contend that Congress in 1920, in adopting the so-called Leasing Act and withdrawing from location lands of the type involved here, also withdrew the requirement of performing assessment work on previously located claims. We find no merit in this contention. It is true that in the event of forfeiture because of failure to do required assessment work, claims so forfeited could not be relocated because of the *inhibitions* of the leasing act. In the situation before us there is no such forfeiture, but rather performance of the assessment work, and acquisition by a co-owner of the interests of other co-owners who do not contribute their proportionate share of the cost of such work.

The trial court properly held that the assessment work was properly done in compliance with requirements of

law; that the notice and publication thereof was proper and adequate, and meets all of the requirements necessary to effect a vesting of the co-owners' interests in Ertl.

The judgment is affirmed.

MR. JUSTICE SUTTON dissents.

MR. JUSTICE SUTTON dissenting:

I respectfully dissent for reasons which more fully hereafter appear.

The statute we are called upon to interpret in 30 U.S.C.A. 28, which reads in pertinent part:

"* * * On each claim located after the 10th day of May 1872, and until a patent has been issued therefor, not less than $100 worth of labor shall be performed or improvements made during each year. On all claims located prior to the 10th day of May 1872, $10 worth of labor shall be performed or improvements made each year, for each one hundred feet in length along the vein until a patent has been issued therefor; but where such claims are held in common, such expenditure may be made upon any one claim; and upon a failure to comply with these conditions, the claim or mine upon which such failure occurred *shall be open to relocation in the same manner as if no location of the same had ever been made, provided that the original locators, their heirs, assigns, or legal representatives, have not resumed work upon the claim after failure and before such location. Upon the failure of any one of several co-owners to contribute his proportion of the expenditures required hereby, the co-owners who have performed the labor or made the improvements may,* at the expiration of the year, give such delinquent co-owner personal notice in writing or notice by publication in the newspaper published nearest the claim, for at least once a week for ninety days, and if at the expiration of ninety days after such notice in writing or by publication such delinquent should fail or refuse to contribute his proportion of the

expenditure required by this section, his interest in the claim shall become the property of his co-owners who have made the required expenditures. The period within which the work required to be done annually on all unpatented mineral claims located since May 10, 1872, including such claims in the Territory of Alaska, shall commence at 12 o'clock meridian on the 1st day of July succeeding the date of location of such claim." (Emphasis supplied.)

This Act of Congress was a belated recognition of the historical right of a citizen to make a mineral location, after discovery, upon the open public domain. It is true that certain conditions were prescribed including one requiring the performance of $100.00 of annual labor on unpatented claims. Oil shale is a recognized mineral and these claims were located under section 28. During at least part of the time since 1920 the Congress has adopted waiver statutes making it unnecessary to perform annual labor on claims and at times the necessary affidavits thereunder were filed for these disputed locations.

We should note that by section 28, supra, and the generally accepted interpretation of title thereunder, claims do not revert to the sovereign except by abandonment or proper challenge. If annual labor is not performed, only two things can happen: (1) the claim may be relocated by others and all rights lost, or (2) a co-owner may do the *required* assessment work and force contribution from his co-owners, or in lieu thereof acquire the title of non-payers after notice by operation of law.

Next we should consider the historical background of oil shale.

It is a well known fact, of which I would take judicial notice, that in western Colorado, eastern Utah and southern Wyoming, there are widespread oil shale deposits with fantastic reserves of oil locked within what is known as the Green River formation. For many decades our citizens have dreamed of commercially exploiting these potentially valuable natural resources, most of

which lie under public lands owned by the United States. From time to time courageous and venturesome individuals have located placers on some of these lands (as was until recently allowed by law), the locators hoping that some technical processes would be developed by which the oil could be extracted profitably in commercial quantities. Some attempts have been made to refine this shale. The most recent of these was during World War II when the United States Government itself set up an experimental plant near Rifle, Colorado. Union Oil Company of California, following the last war, also established a plant in the Grand Valley of Western Colorado for the production of oil from shale. Both these plants have now been closed. The glut of oil in the markets from foreign sources and from our own liquid petroleum makes present production from oil shale in the United States not yet commercially feasible. The contrary has been the case, however, in several other areas of the world, such as Scotland, Spain and Sweden, where with governmental protection the oil shale refining industry has been successful.

The next matter to consider is the Leasing Act (30 U.S.C.A. 193) which withdrew from entry oil shale deposits in the area in which the subject claims are located. The statute, however, has a saving clause which excepted from its operation "valid claims existent at the date of passage of this act *and thereafter maintained in compliance with the laws under which initiated,* which claims may be perfected under such laws, including discovery." (Emphasis supplied.)

It would appear at first blush that the underscored words in section 193 require annual labor to be performed on oil shale claims like these. Two federal court decisions, however, indicate that apparently such is not the case.

In *Wilbur v. U. S. ex rel. Krushnic* (1930), 280 U.S. 306, 50 S. Ct. 103, 74 L. Ed. 445, the Secretary of Interior had refused to issue a patent on the ground that the oil

shale placer mining claims had been forfeited for failure to do assessment work for the year 1920; and the Supreme Court of the United States held that this failure to do assessment work did not defeat the claim if work had been resumed, in the absence of some form of challenge on behalf of the United States to the valid existence of the claim. Thereafter, the case of *Ickes v. Virginia Colorado Development Corporation* (1935), 295 U.S. 639, 55 S. Ct. 888, 79 L. Ed. 1627, was before the Supreme Court of the United States. It involved a suit by the corporation to obtain a mandatory injunction against the Secretary of the Interior requiring him to vacate certain adverse proceedings and his decision declaring certain placer mining claims of the plaintiff to be void. The adverse proceedings were initiated by the Department of Interior on the ground that plaintiff had not performed the annual assessment work and that the United States resumed possession of said land. The court injunction was held proper. This case apparently arose because of the qualifying language in the *Krushnic* case, supra, which was: "Unless at least some form of challenge on behalf of the United States to the valid existence of the claim has intervened."

In my view the net effect of these two decisions was the establishment of the principle that so far as the federal government is concerned, failure to do assessment work for any year is without effect as to originally valid oil shale placer claims. These cases also state that the leasing act of 1920 inaugurated a new policy. The Act itself provides for leases instead of acquisition of oil shale rights by location, and thus there could be no valid relocation on such lands, even if the annual assessment work were not done on claims valid at the date of the enactment of the Act.

In *Krushnic,* supra, the court stated:

"Whenever $500.00 work of labor in the aggregate had been performed, other requirements aside, the owner be-

came entitled to a patent, even though in some years annual assessment labor had been omitted."

Thus whether the Congress so intended, it appears that today by virtue of the saving clause in the Leasing Act and the decisions in *Wilbur* and *Ickes,* supra, the owners of oil shale claims find it possible to hold their claims awaiting perfection of technological processes for refining which will allow oil from shale to compete with liquid petroleum, without need to perform annual assessment work, the reason being that the deposits have been withdrawn from public entry so cannot be relocated and the government itself cannot challenge the ownership for non-performance.

The true question then before this court is whether the forfeiture provisions of Sec. 30, supra, are available to a co-owner to oust his fellow co-owners where oil shale claims are involved. I would answer this question in the negative.

The law abhors a forfeiture and if any valid reason exists upon which we can sustain the rights of all these parties we should do so. In my view Ertl was a mere volunteer and a donor of his work to the benefit of all his co-owners because the work he performed did not have to be done. This must be true, as I have shown that neither an outsider nor the government could disturb the possession of these owners for failure to perform assessment work not required to be done. It follows then that a co-owner may not do so. Ertl would only have the right to go in and produce ore from the claims as a co-owner if he so desired, or seek a partition thereof. As I view it the real reason for the forfeiture provision in Sec. 30, supra, is to protect the interest of a co-owner like Ertl against loss by relocation or by governmental challenge on the ground of non-compliance with the statutory labor requirement. Since title here was not in jeopardy for either of these reasons, we should strictly construe the statute to prevent the forfeiture.

All of the text and case law which I have found is to the effect that in order for one co-owner to forfeit out other co-owners *there must have existed the necessity for doing the work* and if it is not necessary to do the work in order to protect the title, there is no right of forfeiture. For example, in 2 *Lindley on Mines* 1623, sec. 646, it is said:

"Necessarily the work must have been actually done, and there should have existed the necessity for doing it to protect the property. Where performance is not required during any given year, the mere doing of the work for that year will not avail the working co-tenant as the basis for forfeiture."

Under the above quotation is annotated the case of *Royston v. Miller,* 76 F. 50, which will be discussed infra.

58 C.J.S., Sec. 76, states:

"Such a forfeiture cannot be enforced where the delinquency was due to the acts of the delinquent co-tenants; *or where it occurred during a period when the doing of assessment work was suspended.*"

There are two kinds of forfeitures, the first being forfeiture to a new locator and the other forfeiture between co-owners where one has done the work and the other has not contributed thereto. Both, however, are based upon the same premise which is that the law requires the work to be done. If it is not done by anyone, claims are ordinarily open to relocation and if it is done by one co-owner to protect the claims from relocation, the law gives the co-owner doing the work the right to demand contribution, and failing in this the rights of the non-contributing co-owner are forfeited upon compliance with the requirements of the statute. I quote from the case of *Royston v. Miller,* supra, as follows:

"*The suspension of the provisions of the statute requiring annual work to be done necessarily suspended the right of forfeiture.* The forfeiture imposed by the statute was for failing to do the work which the law then required to be done. The suspendatory or amenda-

tory act provided that the work hitherto required need not be done in 1893, and hence it follows that the right of forfeiture could not thereafter exist for any act omitted in that respect during that year. *The enforcement of a forfeiture cannot be had when the law excuses the performance of the condition. The general rule is that statutes providing for forfeitures must be strictly construed.* They are, to that extent, analogous to penal statutes; and the rule is well settled that actions on statutes in their nature penal, pending at the time of the repeal of such statutes, cannot be further prosecuted after such repeal unless the repealing act, in terms, saves the right to prosecute pending suits. There is no such thing as a vested interest in an unenforced penalty or forfeiture. *Royston v. Miller,* et al., 76 Fed. Reporter, Page 50." (Emphasis added.)

It thus seems to me that under existing statutes and decisions that Ertl's attempted ouster of his co-owners should fail. I would reverse the judgment of the learned trial court.